[No. A056957. First Dist., Div. Five. Nov. 6, 1992.]

LIBERTY MUTUAL INSURANCE COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
GUNDA FRYSINGER, Real Party in Interest.

COUNSEL

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Stephen M. Hayes, Pamela E. Cogan and Justice C. McPherson for Petitioners.

No appearance for Respondent.

Joseph W. Carcione, Jr., for Real Party in Interest.

OPINION

**HANING, J.**—Petitioners Liberty Mutual Insurance Company and its president and chief executive officer, Gary L. Countryman, seek a writ of mandate to compel respondent superior court to grant a protective order prohibiting Countryman's deposition (Code Civ. Proc., § 2025, subd. (i)) in a lawsuit brought by plaintiff/real party Gunda Frysinger.[1] This case raises an issue of first impression in California: whether the head of a corporation may be deposed when there is no showing he or she had any involvement in a lawsuit against the corporation, and prior to the plaintiff's exhaustion of less intrusive means of discovery. We hold that under these circumstances a corporate head may not be deposed, and that the trial court abused its discretion by denying the protective order. Accordingly, we issue a writ of mandate.

FACTS[2]

Real party's husband, William Frysinger, suffered an industrial injury on May 30, 1980. Mr. Frysinger, a high-rise sheetmetal worker, fell 65 feet down an empty elevator shaft on a jobsite. He sustained multiple trauma to his head, face and extremities, and was periodically hospitalized until 1983. The injury left him physically and mentally disabled, and he requires 24-hour attendant care for the rest of his life.

Mr. Frysinger was injured in the employ of H.H. Robertson Company. Petitioner Liberty Mutual was Robertson's workers' compensation carrier. The compensation policy provided an injured employee with all medical care for an industrial injury, including 24-hour attendant care. For reasons

---

[1] All statutory references are to the Code of Civil Procedure.

[2] The facts of this case are taken from real party's second amended complaint. At this stage of the lawsuit they are mere allegations. For stylistic purposes we state the facts without the constant repetition of a qualification such as "Real party alleges"; nothing in this opinion's statement of facts, however, should be read as adopting the truth of any substantive allegations of real party's complaint.

which are not entirely clear, 24-hour care was not provided by Liberty Mutual and real party provided that care herself beginning in August 1980.

In February 1988 the Workers' Compensation Appeals Board (WCAB) held a hearing in Mr. Frysinger's case. With representatives of Liberty Mutual present, real party stated that "after eight years of being a virtual prisoner to Mr. Frysinger's horrific disabilities, she was physically and emotionally unable to provide [the] 24-hour-a-day attendant services for him that he so desperately needed. . . ." The Liberty Mutual representatives promised to dispatch an occupational therapist to the Frysinger home to see if round-the-clock care was actually needed. No therapist ever arrived, but Liberty Mutual did arrange for a physician to meet with Mr. Frysinger. The physician concluded that Mr. Frysinger required "24-hour-a-day supervision," and so reported to Liberty Mutual on March 17, 1988.

Liberty Mutual took no action on the medical report until July 21, 1988, when the company's representatives appeared before the WCAB and agreed to provide 24-hour care. Liberty Mutual had no intention of keeping this promise, and only made it to induce real party to continue to care for her husband herself. She did so at the expense of her own health, and suffered a heart attack in December 1988.

Real party filed the present lawsuit seeking compensatory and punitive damages for fraud (based on a "promise without intent to perform") and for intentional infliction of emotional distress. The complaint alleges generally that "all defendants" committed the tortious acts charged, and names as defendants Liberty Mutual, its president and chief executive officer, Gary Countryman, and its local claims manager, Lawrence Gorchoff.[3]

Real party noticed the deposition of Countryman at his offices in Cambridge, Massachusetts. In response, Countryman moved for a protective order under section 2025, subdivision (i), to prohibit his deposition on the ground that real party had no legitimate need to depose him and was doing so only for the purposes of annoyance and harassment. Countryman submitted a declaration stating that he was not involved in the handling, supervision or management of any claims for Liberty Mutual, and that he had no knowledge of the Frysinger case or any facts alleged in real party's complaint. Countryman's administrative assistant, Janet N. Varley, submitted a declaration stating that she was responsible for screening all of Countryman's correspondence, and that she had no recollection of the Frysinger matter or any legal papers or correspondence relating thereto. Varley further

---

[3]Gorchoff is technically a petitioner herein, but the issue raised by the petition concerns only the propriety of deposing Countryman.

declared that any such materials relating to the Frysinger claim and addressed to Countryman would have been shunted to a lower level employee, as "[s]uch material is not given to Mr. Countryman to review personally."

In response to the motion, real party contended that Countryman was "directly implicated" in the "issues presented in the instant litigation." Real party claimed that because Countryman was copied on two letters written by her counsel to Liberty Mutual officials, Countryman thus had "constructive notice" of the alleged fraud and emotional distress committed by Liberty Mutual agents in the handling of her claim. The letters, rather vitriolic complaints on real party's behalf, are written to Liberty Mutual claims adjusters. Each letter shows copies to: "Ms. Linda VanKuren, Liberty Mutual Insurance Co."; "Alfonso J. Moresi, Esquire"; "Manager, Claims Office, Workers' Compensation, Liberty Mutual Insurance Co."; "Manager, Claims Office, Liberty Mutual Insurance Co."; and "President, Liberty Mutual Insurance Co."

Thus, Countryman's only link to the handling of the Frysinger claim was counsel's act of copying him, by title only, on two letters which would have been automatically rerouted to a lower level employee and which Countryman never saw. Notwithstanding Countryman's lack of connection to her case, real party seeks to depose him without first attempting either a deposition of the Liberty Mutual corporation itself or of lower-level employees actually involved in the Frysinger claim. Real party has not served interrogatories on Countryman to further explore the issue of his knowledge of the Frysinger case.[4]

The trial court denied the motion for a protective order, allowing Countryman's deposition to go forward. This petition followed. We stayed the deposition pending resolution of the petition, and now grant a writ of mandate to compel entry of a protective order.

### DISCUSSION

■ Although prerogative writs generally do not issue to review discovery rulings, a writ may issue to review questions of first impression to provide guidance to the bench and bar. (*Oceanside Union School Dist.* v. *Superior Court* (1962) 58 Cal.2d 180, 185-186, fn 4 [23 Cal.Rptr. 375 [373 P.2d 439].) Even when subject to prerogative writ review, a trial court's discovery ruling is not to be disturbed unless the court has abused its

---

[4]Real party did send a set of standard Judicial Council interrogatories to Countryman in 1990. These "boilerplate" interrogatories were insufficient to explore the precise and pivotal issue of the knowledge of a corporate president of the handling of an individual claim.

discretion. (*Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 171 [84 Cal.Rptr. 718 [465 P.2d 854].) ▮▮▮ We conclude it amounts to an abuse of discretion to withhold a protective order when a plaintiff seeks to depose a corporate president, or corporate officer at the apex of the corporate hierarchy, absent a reasonable indication of the officer's personal knowledge of the case and absent exhaustion of less intrusive discovery methods.

Section 2025, subdivision (i) provides that a party may move for a protective order regarding a deposition. On a showing of good cause the protective order may be granted "to protect any party . . . from unwarranted annoyance, embarrassment, or oppression, or undue burden and expense." The statute provides the trial court with an array of less intrusive control mechanisms to limit the impact of the potential burden or oppression of the deposition. The trial court has the ultimate power to enter a protective order directing that "the deposition not be taken at all," and that "the method of discovery be interrogatories to a party instead of an oral deposition."

No California cases involve the invocation of the statute to prevent a deposition of a corporate president who lacks knowledge or involvement in the litigation. At the outset it would seem sensible to prevent a plaintiff from leap-frogging to the apex of the corporate hierarchy in the first instance, without the intermediate steps of seeking discovery from lower level employees more involved in everyday corporate operations. The head of a large national corporation will generally not have knowledge of a specific incident or case handled several levels down the corporate pyramid. Surely an insurance company's chief executive will seldom, if at all, be involved in the day-to-day processing of claims. Indeed, in this case not only does Countryman declare a lack of knowledge or involvement, but his administrative assistant establishes that individual case material or correspondence is habitually rerouted away from Countryman and to a lower level official.

Furthermore, "apex" depositions such as the one in this case, when conducted before less intrusive discovery methods are exhausted, raise a tremendous potential for discovery abuse and harassment. Vast numbers of personal injury claims could result in the deposition of the president of a national or international company whose product was somehow involved. It would be unreasonable to permit a plaintiff to *begin* discovery by deposing, for instance, the chief executive officer of a major automobile manufacturer when *suing* over a design flaw in a brake shoe—especially if *we were to* accept real party's argument that the mere act of copying the chief executive officer with a few pieces of correspondence creates "constructive notice" justifying the deposition.

Although there is no applicable decisional law in California, federal decisions recognize the potential for abuse and generally do not allow a plaintiff's deposition power to automatically reach the pinnacle of the corporate structure. ■ Because of the similarity of California and federal discovery law, federal decisions have historically been considered persuasive absent contrary California decisions. "Because the 1986 [Discovery] Act brings California into closer alignment with the Federal Rules [citation], federal cases are likely to play an even more prominent role in the future." (Weil & Brown, Civil Procedure Before Trial (The Rutter Group 1992 rev.) ¶ 8:19, pp. 8A-9-8A-10.)

In *Salter* v. *Upjohn Co.* (5th Cir. 1979) 593 F.2d 649, the plaintiff's decedent was fatally injured from ingestion of a prescription drug manufactured by Upjohn. Plaintiff attempted to depose Upjohn's president, but the trial court granted a protective order. The Fifth Circuit affirmed, on the basis of Upjohn's "reasonable assertion[] that [the president] . . . did not have any direct knowledge of the facts." (*Id.*, at p. 651.) The court did note it was "very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error. [Citations.]" (*Ibid.*) Nevertheless, the court upheld the protective order because the plaintiff sought to depose the president in the first instance before lower level employees, and because the trial court had provided that plaintiff could take the deposition if the testimony of other Upjohn employees with more knowledge proved unsatisfactory. (*Ibid.*)

In *Mulvey* v. *Chrysler Corp.* (D.R.I. 1985) 106 F.R.D. 364, plaintiff sought damages for personal injuries due to a design flaw in 1975 Dodge vans. He attempted to depose Chrysler president Lee Iacocca. The trial court refused the deposition under Federal Rule of Civil Procedure rule 26 which, like section 2025, subdivision (i), empowers the trial court to shape and restrict the scope of discovery to prevent abuse. Because Iacocca "is a singularly unique and important individual who can be easily subjected to unwarranted harassment and abuse," (106 F.R.D. at p. 366) and because he signed an affidavit expressing ignorance of the facts sought by the plaintiff, the trial judge required that the true state of Iacocca's knowledge first be explored by written interrogatories. (*Ibid.*)

In *Travelers Rental Co., Inc.* v. *Ford Motor Co.* (D.Mass. 1987) 116 F.R.D. 140, plaintiff sought to depose several high-level Ford executives. The trial court adopted the general rule that a plaintiff must first explore high-level knowledge by interrogatory, and only allowed the depositions to go forward because "[t]hat process has already taken place in this case." (*Id.*, at p. 145.) The court also referred with approval to "a number of cases which permit

deferment of the depositions of higher executives until subordinates with supposedly equal or greater knowledge have been deposed." (*Ibid.*) These include *Armstrong Cork Co.* v. *Niagara Mohawk Power Corp.* (S.D.N.Y. 1954) 16 F.R.D. 389 [refusing "shotgun" deposition notice of nine officers and six directors with no personal knowledge] and *M.A. Porazzi Company* v. *The Mormaclark* (S.D.N.Y. 1951) 16 F.R.D. 383 [refusing vice-president's deposition wherein nothing could be contributed beyond that obtained from general claims agent].

Most recently, in *Baine* v. *General Motors Corp.* (M.D.Ala. 1991) 141 F.R.D. 332, the plaintiff attempted to depose a vice-president of General Motors. Plaintiff's decedent was fatally injured by a faulty seat restraint system, and the vice-president had written a memorandum describing his observations of the system's performance in prototype. The federal district court issued a protective order against the deposition, finding that the deposition would be unduly burdensome to a high-level official in the absence of any showing plaintiff could not obtain the necessary information from other, less intrusive avenues of discovery. The trial court required plaintiff to first depose lower level engineering analysts and others with knowledge of the restraint system, and to serve interrogatories on the vice-president to explore whether he had superior knowledge of the system.

██ Consistent with these federal decisions, we hold that when a plaintiff seeks to depose a corporate president or other official at the highest level of corporate management, and that official moves for a protective order to prohibit the deposition, the trial court should first determine whether the plaintiff has shown good cause that the official has unique or superior personal knowledge of discoverable information. If not, as will presumably often be the case in the instance of a large national or international corporation, the trial court should issue the protective order and first require the plaintiff to obtain the necessary discovery through less intrusive methods. These would include interrogatories directed to the high-level official to explore the state of his or her knowledge or involvement in plaintiff's case; the deposition of lower level employees with appropriate knowledge and involvement in the subject matter of the litigation; and the organizational deposition of the corporation itself, which will require the corporation to produce for deposition the most qualified officer or employee to testify on its behalf as to the specified matters to be raised at the deposition. (§ 2025, subd. (d)(6).) Should these avenues be exhausted, and the plaintiff make a colorable showing of good cause that the high-level official possesses necessary information to the case, the trial court may then lift the protective order and allow the deposition to proceed.

We do not believe, as real party suggests, that this holding will frustrate a plaintiff's ability to penetrate high levels of corporate management in a

search for truth. Specifically, we do not agree with real party that a high-level official's protestation of ignorance of a lawsuit is self-serving and automatically suspect. Lower level officials, with some probable connection to a plaintiff's case, are not permitted to avoid deposition by filing conclusory affidavits of ignorance. (See discussion in *Amherst Leasing Corporation* v. *Emhardt Corporation* (D.Conn. 1974) 65 F.R.D. 121, 122.) In the case of an official at the head of corporate operations, however, expressions of ignorance of a specific case or claim are not implausible. At any rate the procedure outlined above will prevent undue harassment and oppression of high-level officials while still providing a plaintiff with several less intrusive mechanisms to obtain the necessary discovery, and allowing for the possibility of conducting the high-level deposition if warranted.

### DISPOSITION

We have previously advised the parties we might act by issuing a peremptory writ in the first instance. (See *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-180 [203 Cal.Rptr. 626 [681 P.2d 893].) Accordingly, let a peremptory writ of mandate issue commanding respondent superior court to vacate its order denying the protective order and to enter an order granting a protective order, subject to the further discovery procedures outlined above. The stay of deposition shall be dissolved upon the finality of this opinion.

King, Acting P. J., and Walker, J.,* concurred.

A petition for a rehearing was denied December 3, 1992, and the petition of real party in interest for review by the Supreme Court was denied January 28, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*Judge of the Napa Superior Court sitting under assignment by the Chairperson of the Judicial Council.