Filed 9/10/13      Second mod for this opinion; first mod. and unmodified opn. attached

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| JEFFERY L. ELLIS et al., | B220286, B227078 |
| Plaintiffs, | (Los Angeles County Super. Ct. No. BC328556) |
| v. | |
| TOSHIBA AMERICA INFORMATION SYSTEMS, INC., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Respondent; | [CHANGE IN JUDGMENT] |
| LORI J. SKLAR, | |
| Objector and Appellant. | |


THE COURT:

It is ordered that the opinion filed herein on August 7, 2013, be modified as follows:

1.  On page 4, the first sentence of the first paragraph, the amount "$11,000" is changed to "$11,900."

2.  On page 39, the second sentence of the second full paragraph, the word "Toyota" is changed to "Toshiba."

3.  On page 45, the second sentence of the disposition, the amount "$179,600" is changed to "$176,900."

The modification changes the judgment.

Appellant's petition for rehearing is denied.

CERTIFIED FOR PUBLICATION.

ROTHSCHILD, Acting P. J.          CHANEY, J.          JOHNSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JEFFERY L. ELLIS et al., | B220286, B227078 |
| Plaintiffs, | (Los Angeles County Super. Ct. No. BC328556) |
| v. | |
| TOSHIBA AMERICA INFORMATION SYSTEMS, INC., | ORDER MODIFYING OPINION |
| Defendant and Respondent; | [CHANGE IN JUDGMENT] |
| LORI J. SKLAR, | |
| Objector and Appellant. | |

THE COURT:

It is ordered that the opinion filed herein on August 7, 2013, be modified as follows:

1. On page 45, the last sentence of the disposition, "section 6087" is changed to "section 6086.7".

The modification changes the judgment.

CERTIFIED FOR PUBLICATION.


ROTHSCHILD, Acting P. J.          CHANEY, J.          JOHNSON, J.

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| JEFFERY L. ELLIS et al., | B220286, B227078 |
| Plaintiffs, | (Los Angeles County Super. Ct. No. BC328556) |
| v. | |
| TOSHIBA AMERICA INFORMATION SYSTEMS, INC., | |
| Defendant and Respondent; | |
| LORI J. SKLAR, | |
| Objector and Appellant. | |


APPEAL from orders of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge. Affirmed in part and reversed in part with directions.

Lori J. Sklar, in pro. per.; Murphy, Pearson, Bradley & Feeney, Harlan B. Watkins and John P. Girarde for Objector and Appellant.

Manatt, Phelps & Phillips, Dean J. Zipser, Benjamin G. Shatz, Carole E. Reagan and Adina L. Witzling for Defendant and Respondent.

_____

Lori J. Sklar represented the plaintiffs in a class action against Toshiba America Information Systems (Toshiba). Sklar appeals from the trial court's orders awarding monetary sanctions against her and the court's order awarding her no attorney fees. Toshiba cross-appeals the order awarding staff fees to Sklar Law Offices. We affirm the order awarding monetary sanctions against Sklar, and affirm in part and reverse in part the order regarding attorney fees.

## SUMMARY

In February 2005, Caddell & Chapman, a Texas law firm with experience litigating class actions, and Sklar, a sole practitioner and a member of the California bar doing business as Sklar Law Offices (SLO) out of her home office in Minnesota,[1] filed a class action against Toshiba,[2] on behalf of a class of purchasers of a Toshiba laptop computer which had an electrostatic discharge problem with the top cover. After a two-day mediation, in November 2005 Sklar and all other counsel signed a settlement term sheet, giving each class member a 12-month repair warranty extension (or, if the class member already had the extended warranty, a $35 credit voucher), and either $25 in cash or a $50 voucher for the repair to replace the defective top cover. Conflicts ensued between counsel regarding the drafting of a settlement agreement. Sklar later objected to the settlement, including an objection to the inclusion of the amount of her fees in the class notice, and the proposed settlement initially was submitted to the court without her signature in May 2006.

After further negotiations, Sklar filed a motion for preliminary approval of the settlement in August 2006. In an attached declaration, Sklar stated that she would seek legal fees of more than $24,700,000 (represented as 25 percent of a settlement value

---

[1] For ease of reference, we will use Sklar's name throughout, using SLO when we refer to time billed by her law office staff (or other issues involving her office staff and not Sklar alone).

[2] Sklar was listed as "of counsel."

2

placed at $98,975,862),[3] to be apportioned between Sklar and Caddell & Chapman, plus expenses of $99,750. Toshiba filed a declaration by counsel stating that it had agreed not to oppose the application by Caddell & Chapman for $1,125,000 in fees, but Toshiba intended to take discovery into the basis of Sklar's "exorbitant" fee request, and would seek the production of documents and the depositions of Sklar and others, including Sklar's expert.

The trial court granted preliminary approval of the settlement in October 2006. The class notice, disseminated in October and November 2006, stated: "Sklar Law Offices will ask the Court for attorneys' fees in the amount of $24,743,965.50, less whatever the Court awards Caddell & Chapman for its attorneys' fees. Sklar Law Offices will ask for litigation expenses in the amount of $114,900. Toshiba will oppose these requests." In May 2007, the court granted final approval and entered judgment.

In January 2008 the trial court awarded Caddell & Chapman $1,050,000 in attorney fees and $75,000 in costs, for a total of $1,125,000. Sklar's initial fee petition, filed later in January 2008, requested fees of either $7,847,362.50 under a lodestar/multiplier approach, or $24,743,965.50 as a percentage of the settlement value, and $410,383.53 in expenses (this time for Sklar alone). Sklar's subsequent fee application in October 2009 requested fees of $12,079,534.69, plus expenses for SLO of $905,752.72.

As promised, Toshiba opposed Sklar's fee request, and protracted litigation and many discovery disputes followed Sklar's initial fee estimate in 2006. On August 31, 2009, the trial court granted Toshiba's motion for monetary sanctions against Sklar in the amount of $165,000 for fees and costs Toshiba incurred related to Sklar's failure to comply with court discovery orders, and her failure to meet and confer in good faith. Sklar appealed, and the sanctions order is the subject of appeal No. B220286.

---

[3] As explained below, Sklar later withdrew the expert declaration of Harvey Rosen upon which this valuation was based.

On June 30, 2010, the trial court issued a 27-page ruling awarding SLO $176,900 in fees (for work during the merits phase of the class action by the staff of SLO), and awarding nothing for Sklar's work; subtracting the $165,000 sanctions award, the net award to SLO was $11,000. Sklar appealed the order denying attorney fees, Toshiba cross-appealed from the award of fees for work by SLO staff, and the fee award is the subject of appeal No. B227078.

We consolidated the two appeals. For the reasons detailed below, we affirm the order awarding monetary sanctions against Sklar, and affirm in part and reverse in part the order regarding attorney fees.

## BACKGROUND

**I.      Sklar disobeyed the court order to allow forensic computer inspections, and the trial court imposed monetary sanctions.**

We describe in some detail the arduous procedural history of Toshiba's attempt to obtain discovery of electronically stored information regarding Sklar's request for attorney fees.

### A.      *Toshiba sought Sklar's electronic billing records.*

After the preliminary approval of the settlement in October 2006, Toshiba began to seek discovery, including document production and Sklar's deposition, related to Sklar's August 2006 statement that she would make a fee request of over $24 million. Among other items, Toshiba sought an electronic, searchable, copy of time records Sklar had produced in hard copy. Toshiba characterized those records as showing that Sklar worked on the class action "nearly all day (sometimes as much as 16.75 hours), every day, seven days a week, including holidays, for some 22 months." Toshiba served subpoenas in October 2006 and January 2007, each of which sought computer data and files related to time billed by Sklar or SLO in the class action. In response, Sklar produced a compact disc (CD) containing Portable Document Format (PDF) copies of the time records, which on appeal she characterizes as "redacted to protect attorney-client and work product privileges." Toshiba continued to request a searchable electronic copy of Sklar's time records.

4

The trial court held a hearing on January 26, 2007 on Sklar's objections to Toshiba's discovery requests, asking Sklar's counsel and Sklar: "[D]o you really think that I'm going to allow this to proceed and give Ms. Sklar the benefit of $24 million in fees without having her be deposed, without having her produce any documents?" Given that Sklar's fee request included time records showing she worked "up to 16-hour days seven days a week for a number of weeks," the court stated that Sklar would have to produce time records which were not redacted. Sklar's counsel argued that the records were complete; counsel for Toshiba rejoined that Sklar had represented that the time records were redacted, and Toshiba was unable to tell what had been excised. The court responded: "I'm not going to take your [Sklar's] word for it, I must tell you. . . . [N]ot with this kind of a request. The amount of money you want is staggering, and I think it has to be . . . scrutinized . . . before I approve this kind of an award." Allowing that "[a]t the end of the day I may award [Sklar] every penny," the court emphasized that Toshiba had the right to verify both that the time records showed what Sklar actually did, and that the claimed attorney time did not represent something that could have been done by a secretary or paralegal.

Counsel for Toshiba requested that the electronic version of the time records be produced "in its native format in the program it was used or at least something . . . searchable." The trial court ordered Sklar to appear for deposition and to produce the electronic time records in "native format,"[4] and told Sklar's counsel to hire an "I.T. expert" or consultant to redact any privileged information.

---

[4] A file that is in native format has been saved in the format designated by the original application used to create it. "Native format is the 'default format of a file,' access to which is 'typically provided through the software program on which it was created.' [Citation.]" (*Aguilar v. Immigration and Customs Enforcement* (S.D.N.Y. 2008) 255 F.R.D. 350, 353, fn. 4.) Documents are often converted to other formats, for example, PDF, for purposes of production in litigation.

At the hearing, Sklar's counsel stated, "I don't even know what 'native format' means." The court responded: "You'll have to find out. I know. Apparently [Toshiba's counsel] knows. You're going to have to get educated in the world of . . . electronic

Toshiba's counsel subsequently wrote to Sklar's counsel to clarify that "[n]ative format is the format[s] in which the documents were originally created and maintained, including all metadata[5] associated with those files." Sklar then produced a CD-Rom containing a set of Microsoft Word files of Sklar's time records which were searchable versions of the time records produced in hard copy, with none of the metadata associated with the original files. Sklar's counsel explained that at the time of the October subpoena the time records only existed in Adobe Acrobat form and had no associated metadata, and the Microsoft Word files were the time records as they existed at the time of the subpoena.

At Sklar's deposition in March 2007, she testified that before she produced the time records (including around the end of 2006), she had converted the records into Adobe format, deleting the original Word files using a program called "Wipe and Delete." Sklar had used this program daily to eliminate metadata. As a result, it was not possible to tell when or how often Sklar created time records, among other things.

After Sklar's deposition, Toshiba requested that Sklar allow Toshiba's expert to inspect Sklar's computers (at Sklar's expense) to determine whether it was possible to recover any of the deleted files and metadata. Sklar refused.

**B.** ***Toshiba filed a motion for sanctions regarding Sklar's destruction of her original electronic billing records.***

Toshiba then filed a motion for sanctions in June 2007. The motion argued that Sklar had destroyed (deleted) files and records that were responsive to the trial court's

---

discovery. E.S.I. [electronically stored information] is here to stay, and these are terms you're just going to have to learn."

[5] "Metadata," or "data about data," is data that provides information about other data, "hidden" or "embedded" information that is stored in electronically generated materials, but which is not visible when a document or other materials are printed. In the context used in this case, metadata includes "data concerning 'the author, date and time of creation, and the date a document was modified.' [Citation.] . . . System metadata is relevant . . . if the authenticity of a document is questioned . . . . [¶] . . . [¶] Metadata thus is discoverable if it is relevant to the claim or defense of any party and is not privileged." (*Aguilar v. Immigration and Customs Enforcement*, *supra*, 255 F.R.D. at pp. 354, 355.)

January 26, 2007 order requiring that Sklar produce her time records in their native format. Toshiba requested that its forensic computer expert be allowed to inspect Sklar's computers to determine whether the original time record files could be recovered. If Toshiba could not recover the original time record files, Sklar would have "purposely destroyed the evidence of how and when her time records were created and edited," warranting terminating sanctions or, alternatively, an order prohibiting Sklar from introducing her time records to support her fee request. Toshiba argued that at a minimum, the trial court should impose issue sanctions, and should determine conclusively that Sklar did not prepare her time records contemporaneously with her work on the case, that Sklar's time records did not accurately reflect the time she claimed to have billed, and that Sklar had not been precluded from taking on other work during the pendency of the class action. Toshiba also requested monetary sanctions of $25,000, less than half the attorney fees Toshiba had incurred in its efforts to obtain Sklar's electronic files.

In a declaration attached to her opposition, Sklar stated that she had no obligation to produce metadata and that backups of the original Word time record files on this case were maintained. She also claimed that her testimony at the deposition (that she had deleted the original files altogether) was limited to a computer she had to return and replace. Sklar understood "native format" to mean "the software program and version used to create the document," which "usually does not include metadata." After the court's January 16, 2007 order Sklar converted her time records (which by then existed in hard copies and PDF format) *back* into Word format, with redactions for privileged information and "little or no metadata." Sklar believed that producing those redacted Word files (not the originals) complied with the court's order. Because Toshiba's requests did not specifically ask for metadata, Sklar argued in her opposition brief that it was sufficient to produce a searchable version of her time records, and added: "In any event, SLO could not have produced what did not exist, and thus, could not have produced metadata that had been removed pursuant to ordinary business practice long before [Toshiba] sought electronic records of any sort."

7

In reply, Toshiba argued that Sklar's claim that she possessed backup files of her time records contradicted her deposition testimony, and that she had an obligation to preserve the original files (including the metadata showing when and how often Sklar entered her time).

### C. *The court ordered Sklar to allow forensic inspection of her computers.*

At the August 15, 2007 hearing on Toshiba's motion for sanctions, the trial court stated: "When I said produce native format, I wasn't thinking about metadata one way or the other," and noted that Toshiba's subpoena said nothing about metadata. Counsel for Toshiba pointed out that the metadata no longer existed at the time of the order in January 2007, because Sklar had already removed the metadata from the time files. The court agreed: "So it's not a question of her violating my order with respect to metadata. . . . What I'm concerned about is this is a person who wants $22 million and some change in legal fees, knows when she starts preparing . . . timesheets, . . . knows that this will be the heart and soul of her claim for attorney fees and does not preserve the early drafts." The court declined to say that "metadata is included in native format."

Nevertheless, the court stated that in the context of a request for class action attorney fees, "it is extremely poor judgment to wipe and delete an original file of your timesheets." When Sklar's counsel protested that Sklar had not deleted any time records, the court stated: "Well, we're going to find out because I'm going to appoint an expert to search her hard drives." The expert would be of Toshiba's choosing and at Toshiba's expense, although if the expert determined that the time records were not contemporaneous with the work claimed, the cost would be shifted to Sklar which "will only be my first step." Sklar's counsel claimed that the backup of the original Word file was in Minnesota, but contained privileged information. The trial court responded that Sklar had testified that she had wiped and deleted the original Word file, and "I think she's really misleading me. I'm beginning to get very upset with this." The court believed "the backup has metadata on it. I'll bet you anything."

The trial court ordered that the parties select a neutral expert to search the backup file and produce anything that was not privileged, reserving a ruling whether any relevant

8

privileges were waived.  The court also reserved the issue of monetary sanctions:  "I tend to think that you [Toshiba] are going to be entitled to something, but I want to see what happens with the metadata, with the backup file.  But I will tell you that the testimony in the deposition coupled with the briefs coupled with the behavior here is such that I probably could conclude by a preponderance of the evidence that this has constituted a discovery abuse under [section] 2023[.010]**6** of the Code of Civil Procedure, and I think that Toshiba is going to be entitled to a monetary sanction. . . .  [¶] . . . [¶]  There just seems to be kind of a shifting series of explanations which concerns me deeply."  "[R]ight now I want to get on to the table what Ms. Sklar has that comes as close as possible to being an original file of these timesheets . . . .  Everything else I'm reserving."

---

**6** Unless otherwise indicated, subsequent statutory references are to the Code of Civil Procedure as currently numbered following the reorganization and renumbering of the Civil Discovery Act effective July 1, 2005.

The Electronic Discovery Act, effective June 29, 2009, after Sklar refused to allow the inspections ordered by the court, added to the Code of Civil Procedure provisions regarding electronic discovery, including section 2031.060, subdivision (i), which states: "The court shall not impose sanctions on a party or any attorney of a party for failure to provide electronically stored information that has been lost, damaged, altered, or overwritten as the result of the routine, good faith operation of an electronic information system," adding "[t]his subdivision shall not be construed to alter any obligation to preserve discoverable information."

There is little California case law regarding discovery of electronically stored information under the Act.  "Because of the similarity of California and federal discovery law, federal decisions have historically been considered persuasive absent contrary California decisions."  (*Liberty Mutual Ins. Co. v. Superior Court* (1992) 10 Cal.App.4th 1282, 1288.)  Federal decisions hold that production of electronically stored information in PDF format may not be sufficient if the requesting party can show that the format "'is not "reasonably usable" and that the native format, with accompanying metadata, meet the criteria of "reasonably usable" whereas the PDF . . . format[] do[es] not.'" [Citation.]"  (*City of Colton v. American Promotional Events, Inc.* (2011) 277 F.R.D. 578, 583.)  Federal case law also provides that parties are subject to a general duty to preserve such things as deleted data, backup tapes, and metadata that constitute "'unique, relevant evidence that might be useful to an adversary.'  [Citation.]"  (*Victor Stanley, Inc. v. Creative Pipe, Inc.* (2010) 269 F.R.D. 497, 523–524.)

The notice of ruling and August 15, 2007 minute order required Sklar to agree on a neutral expert with Toshiba, splitting the cost. Within 30 days of the expert's selection, the neutral expert was to search the back-up files. During the same time period, Sklar was to permit an expert selected and paid by Toshiba to search Sklar's hard drives to recover time record files, including metadata, related to the class action. Sklar objected to the notice of ruling.

Sklar brought a motion for reconsideration of the August 15, 2007 order, which Toshiba opposed. At a hearing on October 2, 2007, Sklar's counsel argued that "metadata for time records in a Word document that is supplemented over time . . . by a lawyer in a class counsel case is not reliable and is never going to be relevant. And because it's not reliable, its discovery couldn't possibly lead to the discovery of admissible evidence." Counsel for Toshiba countered that if any metadata were recovered, its relevance would then be determined: "this is the kind of thing we don't know until we get there." The court agreed. The court denied the motion on the ground that it did not meet the standard for reconsideration; in addition, the court reaffirmed its August 15, 2007 ruling on the merits.

Sklar also brought an ex parte application to stay the order, which the court denied.

### D. The parties could not agree on a neutral expert or establish a protocol for inspection by Toshiba's expert.

In an email to Sklar's counsel late in September 2007, Toshiba's counsel mentioned Kroll OnTrack, Inc. (Kroll) as a possible neutral expert to examine the backup files. Sklar's counsel sent Toshiba a suggested protocol for Toshiba's inspection in October 2007, after Sklar's motions for reconsideration and for stay were denied, but Toshiba declined in part because the protocol limited the inspection to one hard drive and restricted communications between Toshiba and its own expert.[7] Further exchanges

_____

[7] The protocol was attached to an email dated October 19, 2007 from Sklar's counsel. Sklar attached a *different* protocol as an exhibit to her August 29, 2008 declaration in support of her opposition to the order to show cause, referring to it (as she

10

followed.  Before any specifics were established, on January 31, 2008, Sklar filed a voluminous fee petition, seeking a fee hearing on February 29, 2008, without completion of the court-ordered inspections.  Sklar's petition requested $24,743,965.50 plus expenses if fees were calculated as 25 percent of the settlement value, or $7,847,362.50 plus $410,383.53 in expenses under the lodestar approach.  The trial court continued the hearing and eventually took it off calendar.

On March 12, 2008, Toshiba sent a letter to Sklar stating that in spite of numerous follow-up inquiries, Sklar had yet to accept or reject Kroll or propose another neutral expert.  Toshiba planned to submit Kroll's name to the court on March 14 as a proposed neutral expert, unless it heard back from Sklar.  Sklar then told Toshiba's counsel (also in March 2008) that she would not agree to Kroll because Kroll had done work for Toshiba's former counsel.  Toshiba attempted to schedule an inspection, but Sklar conditioned the inspection on the entering of a protective order.  Subsequently, in a status conference statement filed on March 28, 2008, Sklar stated that she had retained Kroll as her consultant.

The court entered a formal stipulated protective order on April 24, 2008, providing that the party to whom any electronic information was produced could not argue that the production waived any claims of privacy, confidentiality, or privilege by the producing party.

At a status conference on May 8, 2008, Toshiba explained that after it suggested Kroll as the neutral expert to examine the backup files, Sklar had retained Kroll.  Sklar admitted that she retained Kroll as a consultant, but denied that she consulted Kroll after Toshiba proposed Kroll as an expert.  Sklar's counsel represented that Kroll was retained before the September 2007 letter from Toshiba, and the court stated:  "I'm afraid you're

_____

does in her appellate brief) as the protocol she proposed on October 19, 2007.  Both protocols begin with the imaging of Sklar's hard drive.  A significant difference between the two is that the protocol attached to Sklar's declaration—which was *not* (contrary to Sklar's representation) the protocol she proposed on October 19, 2007—excluded counsel for Toshiba from being present at the inspection.

11

going to have to give me some records to establish that." As for Toshiba's expert inspecting Sklar's hard drive for the deleted files, Sklar's counsel suggested that the court did not have jurisdiction over Sklar as a Minnesota resident to make its August 15, 2007 order, and the court reacted angrily: "You're telling me you're not going to obey. You're telling me I don't have jurisdiction. You're telling me the order is wrong. You're telling me all sorts of things, everything other than you intend to comply." Sklar's counsel expressed concern about protecting privileged information. The court stated that Toshiba's expert was to pull only Sklar's time record files associated with the class action. The court warned Sklar that if the electronic time records were not disclosed, the court would consider the time records that Sklar had produced earlier as weaker evidence produced when stronger evidence was available. The court urged the parties to agree on a protocol for Toshiba's inspection, follow the court's suggestion, or contact the court for assistance.

### E. The court ordered the inspections by Toshiba's expert to occur on July 22 and 23, 2008.

At a status conference on June 24, 2008, the trial court expressed exasperation with the "morass of charge and countercharge" regarding the fee request and the lack of progress with discovery. The inspections had not been done and Sklar's deposition had not been completed. The court warned that if it decided that Sklar had violated its order regarding her deposition, "I'm just going to deny her all her fees, and that will be the end of this." The court ordered the completion of Sklar's deposition in Minnesota on July 24 and 25, and again stated, "I will award you zero for this class action" if Sklar interposed "a string of objections and speech-making during the deposition."

Turning to the inspections, the court ordered Toshiba's inspection to take place on July 22 and 23, also in Minnesota. As to the selection of a neutral expert, Sklar's counsel admitted that he could not pinpoint when Sklar contacted Kroll. Toshiba's counsel disputed Sklar's assertion that she had contacted Kroll and provided Kroll with privileged information, before Toshiba suggested in September 2007 that Kroll serve as the neutral. The court declined to "assign[] blame on either side" and concluded "we just need

12

another neutral," directing the parties each to submit a few neutrals for the court to select one. "I'll find a neutral, but I do want at least Toshiba's expert to be able to run this inspection during the week you're all back in Minneapolis. So that inspection I want to happen."

The June 24, 2008 minute order stated that Toshiba's expert's inspection of Sklar's computers would take place on July 22 and 23.

### F. *Sklar refused to allow the ordered inspection to proceed.*

Sklar sought writ relief from the court-ordered inspection and from her deposition. The court of appeal summarily denied the writ on July 17, 2008. The next day, July 18, Toshiba sent an e-mail regarding the procedure for the inspection by Toshiba's expert on July 22 and 23, proposing: "As we have discussed in the past, the first step is to make an image of the hard drive(s)" for off-site inspection by the expert at his offices with Sklar present, if she desired. Sklar responded three days later on July 21, the day before the ordered inspection, stating: "[K]nowing that it is now your expert's intention to image my hard drives, the inspection will not proceed. Contrary to your false assertion, we have never discussed or contemplated that my hard drives would be imaged, let alone removed off site by any expert," and the court had not ruled that an image of the hard drive could be taken. (As explained above, Sklar's own initial protocol for the inspection sent to Toshiba's counsel on October 19, 2007, had included imaging by SLO of the Hewlett Packard hard drive used by SLO to create the time records produced by Sklar in February 2007, although inspection of the image was to be at SLO's offices.) Toshiba replied that it would address the last-minute cancellation with the court and intended to proceed with Sklar's deposition.

At a hearing on July 28, 2008, Toshiba's counsel stated that Sklar cancelled the inspection hours before one counsel was on a plane and when Toshiba's experts were about to head to the airport. Counsel explained that the imaging of Sklar's hard drive would make the inspection less disruptive, allowing inspection of the image without having to view the hard drive itself. The parties disputed whether the parties had agreed Toshiba could image Sklar's hard drive. Sklar's counsel stated that imaging "was totally

13

contrary to any protocol that has been discussed," and the previous order gave Toshiba's expert two days to go through the hard drive and look for metadata. The court then stated that Toshiba's expert could go to Minnesota and work on the hard drive itself with "free and unfettered access to the hard drive," and added that as far as an order for inspection goes "I'm beginning to conclude [the problem] lies with [Sklar]. [¶] . . . [¶] I'm going to issue an order to show cause as to why I should not draw a negative inference from the failure of your office to permit any inspection whatsoever of your computer drives by any expert, be it a neutral or Toshiba's expert. [¶] And the negative inference I would draw is that the hard copy time records . . . are not accurate and that conflicting information and perhaps contradictory information is available on the hard drive of your computer. And I will consider that negative inference in connection with your fee petition." The court set the order to show cause (OSC) hearing for September 10, and stated that Sklar could discharge the OSC by providing a "real opportunity" for inspection by the experts. In the court's view, "it appears that the plaintiffs have really done everything they can to frustrate the purpose. And even after the writ was denied, it seems at the last minute they came in with more subterfuges."

In opposition to the OSC, Sklar stated: "[T]here is substantial justification and good cause for Sklar's refusal to permit the inspection to proceed," based on Toshiba's rejection of Sklar's "attempt to propose a reasonable protocol" and insistence on imaging her hard drive for inspection elsewhere. "If this is to be the Court's order, then Sklar again requests a written order so that she may seek appellate review of the Court's decision."

At the OSC hearing on September 10, 2008, the court stated that "despite all of the statements I made regarding the metadata, and having an expert image Ms. Sklar's hard drive, it just hasn't happened. I made orders to that effect and it hasn't happened." Acknowledging Sklar's privacy and privilege concerns, the court noted that given the "extraordinarily high amount of money" requested, "Ms. Sklar, it's understood that any supporting evidence should have been preserved and it wasn't." Rather than draw any conclusions, the court informed the parties that because Sklar failed to produce better

14

evidence, the court as the finder of fact would draw a negative inference as to the reliability of the time records produced by Sklar, applying CACI No. 203 and CACI No. 204 when reviewing Sklar's fee application.[8] Toshiba reiterated that it planned to file a motion for monetary sanctions. The court ruled that the OSC had not been discharged.

### G. Toshiba filed a motion for monetary sanctions against Sklar, and the court awarded Toshiba $165,000.

Toshiba filed its motion for monetary sanctions in March 2009, arguing that Sklar's destruction of the electronic time files and her subsequent conduct had resulted in a year of motions, discovery, briefings, argument, and attempts to agree to a neutral inspector and proceed with the court-ordered inspection, "all of which Sklar resisted." Toshiba requested monetary sanctions of "at least $217,317." In opposition, Sklar argued that her opposition to the inspection was reasonable, and that the inspection would have violated privileges and privacy. Sklar also argued that Toshiba had never requested metadata, so that its absence could not be a basis for the imposition of sanctions.

At the hearing on the sanctions motion on April 24, 2009, the court asked whether there had been an inspection of Sklar's hard drive by Toshiba's expert and whether there had been an inspection by a neutral expert to produce the alleged backup files, as required by its two prior orders. Sklar's counsel responded that neither inspection had occurred, and the court rejoined, "It sounds to me at this point as though my orders have been violated." The court reiterated that it would take into account CACI No. 203 and CACI No. 204, and that "it looks as though by a preponderance of the evidence that evidence has been withheld or suppressed." Turning to the question of how much Toshiba should be reimbursed "because the orders just weren't complied with," the court indicated that it would not consider time Toshiba spent dealing with the metadata. "To the extent you are

---

[8] CACI No. 203 provides: "You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence." CACI No. 204 provides: "You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."

making motions because Ms. Sklar violated my orders for inspection by the [Toshiba] expert and by a neutral expert, you are entitled to your costs and attorney's fees. [¶] To the extent money fees were expended regarding her failure to preserve meta data, I [am] not going to sanction her. . . . [¶] But if I order an expert to go look at the file, even if all that person is going to find is meta data, that order should be complied with. It should have been observed. I made the order and . . . it was violated. . . ." The court clarified that the sanction would be imposed under section 2023.010.

Counsel for Sklar objected that there had been no order imposing a protocol for the inspections, so that Sklar was substantially justified in disobeying the court's orders. The court rejoined: "Let me tell you something, the record in this case is one of obfuscation and delay by the plaintiff. [¶] And it constitutes a violation of at least two of my orders." The court advised Toshiba that the revised sanctions request could be submitted by way of a revised declaration.

At the final hearing on Toshiba's sanctions request on July 9, 2009, the court repeated, "I'm not going to sanction Ms. Sklar for anything involving the meta data, but the rest of it is on the table." Sklar's counsel admitted that Sklar knew about the August 15, 2007 minute order, but argued that the minute order was not sufficiently clear. The court rejoined, "The minute order suffices." Sklar's counsel then challenged the revised declaration from Toshiba's counsel regarding time spent, because Toshiba did not attach the attorneys' time records; the court responded that he would order Toshiba to produce the time records, redacted for privilege, if Sklar would pay Toshiba's costs for the redaction.

The court granted the motion for monetary sanctions, citing in support section 2023.010, subdivisions (d), (e), (f), and (g). The court indicated that it would impose sanctions of $165,000, deductible from any amount that Sklar received when the court determined her application for attorney fees.

In an order filed August 31, 2009, the court imposed monetary sanctions of $165,000 against Sklar and in favor of Toshiba for "misuse of the discovery process, including under . . . sections 2023.010[, subdivision] (d), 2023.010[, subdivision] (e),

16

2023.010[, subdivision] (f), and 2023.010[, subdivision] (g)," [9] including, among other things: "[f]ailing, without substantial justification, to comply with this Court's August 15, 2007 and June 24, 2008 Orders on the forensic inspection of Sklar's computers"; and "[f]ailing to meet-and-confer in good faith regarding both of the Court-ordered inspections." Sklar's appeal in No. B220286 followed. The sanctions order is directly appealable, as it exceeds $5,000. (§ 904.1, subd. (a)(12).) The interim order awarding sanctions is also appealable because a final judgment has been rendered in the fee litigation, in which the sanctioned behavior occurred. (See *In re Marriage of Niklas* (1989) 211 Cal.App.3d 28, 36, fn. 4.)

**II.     After continued litigation, the trial court awarded fees to Sklar's staff only.**

*A.     Depositions, hearings, and motions to enforce the settlement agreement followed while the fee petition was pending.*

At the April 24, 2009 hearing, counsel for Toshiba requested that the court allow two more days of Sklar's deposition to address "specific time entries" regarding Sklar's fee requests. The court granted Toshiba two more days, with the deposition to be completed by June 30, 2009.

Sklar's deposition continued in Minnesota on June 23 and 24, 2009. On each of the two days, Sklar produced a box of documents for the first time, containing what she represented were handwritten time records and other documents in support of her fee petition. Toshiba returned to court to argue that it had sought those documents by subpoena since 2006. On July 9, 2009, the trial court set an OSC, ordering Sklar to show

---

[9] Section 2023.010 provides: "Misuses of the discovery process include, but are not limited to, the following:  [¶] . . . [¶]  (d) Failing to respond or to submit to an authorized method of discovery.  (e) Making, without substantial justification, an unmeritorious objection to discovery.  (f) Making an evasive response to discovery. (g) Disobeying a court order to provide discovery."  Section 2023.010, subdivision (i), adds as conduct subject to sanctions "[f]ailing to confer in person, by telephone, or by letter with an opposing party or attorney in a reasonable and good faith attempt to resolve informally any dispute concerning discovery, if the section governing a particular discovery motion requires the filing of a declaration stating facts showing that an attempt at informal resolution has been made."

17

cause why she should not be barred from using the documents to support her fee petition. After a hearing on August 24, 2009, the court ordered that Sklar's deposition would resume in September 2009, with the first day at Sklar's expense. Sklar was ordered to bring the originals of the documents to the deposition for inspection by Toshiba's expert, and if Sklar did not go forward with the deposition and document inspection, Sklar would be barred from using the documents in support of her fee petition. Sklar did not appear for the deposition or produce the original documents.

Toshiba also sought to depose Susan Goldstein, Sklar's sister and a member of SLO's staff, who had purportedly billed more than 6,000 hours. These efforts, including subpoenas, eventually resulted in Goldstein's deposition in May 2009. Toshiba was able to take the deposition of Barry Voss, a Minnesota lawyer who submitted a declaration stating that Sklar's involvement in the class action prevented her from working on other cases, only after moving to compel Voss's deposition after Sklar and Voss filed written objections the day before the deposition was originally scheduled, stating that Voss would not appear.

Sklar's August 2006 fee request included a declaration from attorney Harvey Rosen regarding the value of the settlement (Rosen estimated the value to be $98,975,862) and an affidavit from Professor Arthur Miller supporting the amount of fees requested (and using Rosen's estimate of the settlement value). Toshiba encountered difficulties in scheduling the depositions of Sklar's experts. A month before Rosen's deposition in August 2009, Sklar withdrew him as an expert in the fee matter, and her counsel represented in an email that Sklar did not intend to cite his declaration in support of the fee petition.[10] At Professor Miller's deposition in August 2009, he produced what Sklar herself described as "7000+ Pages of Documents," most of which were responsive

---

[10] In spite of her withdrawal of Rosen as an expert, Sklar cites his declaration and his valuation of the settlement value more than once in her opening brief on appeal as support for the reasonableness of her fee request, and (although Toshiba's respondent's brief points out Sklar's citation of Rosen's withdrawn declaration) Sklar again cites to Rosen's declaration in her reply brief.

to a request Toshiba had made in April 2008 for material related to communications between Sklar and Professor Miller.

While the litigation and discovery disputes related to Sklar's attorney fees request continued, Sklar also filed multiple motions to enforce the settlement agreement, all of which alleged that Toshiba had breached the agreement and all of which were denied. Sklar wanted to communicate with the class without proceeding through the claims administrator and at Toshiba's expense; on June 24, 2008, the court deferred a ruling ("Ms. Sklar, unless and until you show a breach of the agreement, I'm not ordering them to pay for communication between you and the class"). As the court said to Sklar in a hearing on July 28, 2008 before denying the motion without prejudice, "You want me to enforce a settlement agreement involving hundreds of thousands of people, and you don't give me the evidence. It may be that [Toshiba's counsel] know about [issues that class members had with the settlement]. But I don't know that they know. You have given me no evidence to that regard." On December 18, 2008, the court commented "[y]ou've essentially put the same evidence in front of me and I see no difference this time around. I still don't see evidence of a breach," and ruled that Sklar would have to pay the cost and proceed through the class administrator. When Sklar once again filed a motion for a second class notice in November 2009, this time to notify the class that Sklar sought almost a million dollars more in costs than the maximum amount represented in the first class notice, the court stated at the hearing in April 2010 that the agreement was very clear that no extra costs were allowed, and denied Sklar's motion.

**B.	*The court held a hearing on Sklar's fee petition.***

Sklar's motion for attorney fees, filed October 28, 2009, requested "fees of up to $12,079,534.69 and expenses in an amount of $905,752.72," and reserved the right to make a future application for additional fees and expenses. Sklar based the requested fee award on her lodestar with a multiplier of two before the effective date of the settlement agreement (May 5, 2008) plus "reasonable incurred costs" and a 1.75 enhancement on fees thereafter.

19

The court heard the fee motion on April 5, 2010. Sklar began by stating "there's never been a claim for 20 some-million dollars" in fees, and "I have never asked for more than what is set forth in my fee petition [¶] . . . [¶] roughly $12 million." Asked by the court why the class notice gave the higher amount of $24 million, Sklar answered that she had calculated that number using Rosen's valuation (since withdrawn) and an "alternative methodology": "I don't think there was any intent at the time other than being able to provide that the maximum value that could be sought as a methodology for the court's determination as set forth in the settlement agreement." Her current request was lodestar-based rather than based on a valuation of the class settlement. The court responded: "[Toshiba] is saying that . . . your original request[s] were so grossly inflated as to justify an award of nothing now. And I must tell you, Ms. Sklar, that argument is finding a responsive chord with me. I'm not even sure $12 million is appropriate in this case. That too may be very excessive."

The court denied Sklar's request for an updated notice to the class specifying additional costs beyond the maximum of $114,900 in the original class notice. Turning to Sklar's fee request, the court stated: "I think there's a basis to deny all fees altogether."[11] Sklar's time records seemed "grossly exaggerated," much of what she did appeared to be work more suited for paralegals, and "the case law justifies a complete denial of fees if a fee request is overinflated." The case had not been complicated when it settled and the parties quickly reached an agreement, at which time Sklar initially sought more than $24 million (as a percentage of the value of the settlement); then Sklar settled on a lodestar approach, generating time sheets that had her working around the clock, which the court "ha[d] trouble believing." Toshiba's counsel stated that Caddell & Chapman had taken the lead on the litigation, not Sklar. The court noted that Sklar had billed 900 hours for investigation by the time the case was filed, and pointed out discrepancies between her written time slips and her summary table submitted with the

_____

[11] Overruling Sklar's objection, the court stated that it relied on a declaration by Toshiba expert Professor William Rubenstein.

20

fee request. Toshiba's counsel then represented to the court that Sklar had lodged those handwritten records contrary to a court order excluding them unless Toshiba could have them forensically examined.

The court read from Sklar's exhibits to the petition for fees and cited her claims that Sklar worked on the case from December 21–27, 2004 and New Year's Eve, 2004, and New Year's Day, 2005, every day, for eight, nine, or ten hours a day, stating "at some point it goes over the top," and suggesting that the claimed hours were not reasonable. The court found the declaration of Toshiba's expert, William Rubenstein, much more convincing than that of Sklar's expert, Professor Arthur Miller, "who apparently only looked at one side of the story." The court gave Sklar 10 days to submit Professor Miller's deposition transcript and other briefing, after which the fee matter would be submitted. Two days later, Sklar elected not to file further evidence and requested that the matter be submitted for decision.

### C.     The court denied Sklar's petition for attorney fees and awarded $176,900 for the work of SLO staff.

The court issued its meticulous 27-page opinion on June 30, 2010, and we summarize its detailed reasoning.

#### 1.     The merits phase

First, the court cited Sklar's original fee request of over $24,740,000, made at the conclusion of the merits phase of the class action (preceding the motion for preliminary approval of the settlement) and again in her first fee petition in January 2008 (including a multiplied lodestar of $1,269,012 for work related to the fee request). Noting that Sklar's January 2008 petition therefore requested a fee amount of approximately $23,470,000 for the merits phase of the case, the court compared that amount to the fee request before the court at the April 2010 hearing, in which petition Sklar requested $12,079,534.69 for all phases of the case. Sklar had repeatedly denied having asked for $24 million in fees, and her "dissembling and outright distortions" "ha[ve] seriously damaged her credibility with this Court." The court therefore doubted her word on her purported lodestar, and her "reduction by over half of the fees SLO originally requested calls into serious question

21

the legitimacy of her numbers. One raises an eyebrow upon learning that work she once said was worth over $23 million now deserves a lodestar of only $3.3 million.[12] Indeed a court would be justified in denying outright SLO's fee request for this reason alone," citing *Serrano v. Unruh* (1982) 32 Cal.3d 621, 635.

The court also described Sklar's behavior during the pendency of her fee applications, concluding that she improperly resisted Toshiba's efforts to inspect and verify her time records, and violated two discovery orders (the subject of the sanctions). Applying the negative inferences in CACI No. 203, the court concluded that SLO's "confusing, suspect summaries and disorganized, incomplete handwritten notes" were weaker evidence of her time records where stronger evidence was available. CACI No. 204 allowed the court to consider whether a party intentionally concealed or destroyed evidence, and "Sklar concealed and destroyed evidence. . . . The Court concludes that the records Ms. Sklar never produced would have shown that she devoted less time to this matter than she claims to have spent." Sklar's numerous accusations of unethical behavior against other participants (including the trial court) were inappropriate and unprofessional behavior, which also justified a denial of fees.

The court addressed Sklar's claimed time and fees during the merits phase (3,600 hours, or 27 percent of the total), from Sklar's discovery of the laptop defect when she purchased one for personal use in October 2004, through her investigation of the defect, her association with Caddell & Chapman, the filing of the class action in February 2005, and up until the agreement to settle with Toshiba, reached in April 2006. Noting that "[t]he facts of this class action are not difficult," the court acknowledged that Sklar helped to identify the defect and collected evidence and associated cocounsel, "activities [which] undoubtedly created value for the class and may have constituted the *sine qua non* for this class action." Nevertheless, the court found that "Sklar's billing records are, for purposes of calculating the lodestar, unusable. They contain troubling inconsistencies

---

**12** Sklar's petition requested $6,643,157.50 for the merits phase, after application of a multiplier of two.

and omissions.  There are numerous instances of what appear to be inaccurate and even contradictory billing entries.  Moreover, the total number of hours claimed is excessive.  The only conclusion that this court can reach is that the attorney's records of the time actually spent cannot be fairly relied upon."  Sklar's time estimate for the time she spent over five years (from October 2005 to October 2009) showed her working almost 11 hours a day, including weekends and holidays; even shared with her staff, "the numbers are hard to accept."[13]  Although the court did not believe Sklar's proffered hours, they also included activities as a member of the class rather than as counsel, and activities that should have been handled by an expert witness, a fact investigator, or a paralegal; the litigation was almost exclusively aimed at settlement, with modest monetary relief; and Caddell & Chapman's slightly more than $1 million fee request was persuasive evidence that Sklar's claim was excessive.  The court inferred that Sklar destroyed some or all of her original time records.

The court noted that awarding a percentage of the recovery (as Sklar initially requested) is "only a cross check against the lodestar method," and as Sklar now relied on the lodestar, the court would use that measure.  Sklar's time records were "disorganized, contradictory, and ultimately untrustworthy," and were not usable to calculate a lodestar.[14]  Even without the negative inferences in CACI Nos. 203 and 204, "the Court is forced to engage in speculation and guesswork in trying to figure out her lodestar for the merits phase," and contradictory, multiple billing "destroys Ms. Sklar's credibility."

---

[13] Sklar's appellate brief puts the number of attorney and paralegal hours expended by SLO at "over 20,054.50 hours expended over more than 5 years," which yields a similar number of daily hours purportedly spent on the class action.

[14] Sklar's "handwritten pages do not corroborate her summaries" of "six different table summaries . . . . Many cover the same specific dates multiple times.  Four of the six summaries overlap.  Only two of the six summaries cover the merits phase, and both of them overlap."  Because the records were disorganized and not supported by handwritten or original "time slips, computer records, or other corroborating evidence of Ms. Sklar's personal time, there is no way for the Court to know whether Ms. Sklar was repeatedly double billing her time."  The court cited numerous examples of specific double billing.

Although it was difficult to separate the time Sklar claimed to have spent on the merits of the class action from the time she spent litigating her fee request, "it appears that she spent twice the amount of time litigating for fees as she did handling the merits." Her "jumble" of time records and supporting materials "deserve no weight," and she had not met her evidentiary burden to establish the hours she spent litigating the class action.[15]

Nevertheless, "The Court does accept the hours performed by Ms. Sklar's staff. They have submitted records that appear to be in order." The staff billed a total of 1,769 hours at $100 an hour. The court declined to apply a multiplier. The total fee award for SLO staff was $176,900.

### 2. The preliminary approval/objector phase

The court described how after the mediation in November 2005, as the parties sought to draft a settlement agreement based on the term sheet, Sklar and Caddell & Chapman disagreed regarding attorney fees. Caddell & Chapman filed a motion for preliminary approval of the settlement. Sklar attempted to remove Caddell & Chapman as cocounsel and objected to the settlement on grounds including one that "would have hidden the amount of her requested attorney's fees from the class by omitting it from the class notice. . . . The Court refused to approve such chicanery." The notice included the exact dollar amount of Sklar's fee request.

A detailed discussion of Sklar's objections to the preliminary settlement followed, including her arguments that she should be paid for representing class members during the settlement's dispute resolution process (the final settlement allowed her to petition for

---

[15] The court also concluded that Sklar's stated rate of $400 an hour was too high, and based on the court's observations of Sklar over five years and the problems discussed in the order, Sklar's appropriate hourly rate was $210. "But again, the court cannot calculate a lodestar for Ms. Sklar's work because it does not trust her time records." Further, even if a lodestar could be calculated, "the questions presented by this matter were neither difficult nor novel," the quality of Sklar's representation "was average at best" (and at the settlement phase, "her skills and judgment proved to be less than average"), and the court did not believe Sklar was precluded from accepting other significant employment. Therefore, no multiplier was appropriate.

such fees); that her exact fee amount did not need to be included in the notice (as explained above, this was an unsuccessful objection); that the proposed settlement did not include a provision awarding her fees (Sklar was not a signatory to the proposed settlement, and the final settlement acknowledged that she had a right to request fees); and that Caddell & Chapman should not be appointed as class counsel, including opposition to the firm's fee request (the court overruled this "frivolous" objection). "The objections demonstrate that the vast majority of Ms. Sklar's efforts were not calculated to benefit the class, but to protect or inflate her fee claim," and Sklar had achieved only "de minimis" success. The court did not believe Sklar's claim of 1,060 hours during this part of the litigation. Further, Sklar "accomplished next to nothing" and put her interests before those of her client, delaying the preliminary approval of the settlement, and therefore "deserves no portion of her lodestar. The Court in its discretion declines to award SLO anything for its efforts in objecting to the settlement terms."

### 3. The attorney fees application phase

The litigation over Sklar's fees began with her declaration filed in August 2006, seeking $24,743,965 in fees, and Sklar reported spending more hours on this phase of the litigation than on the other two combined. Sklar then resisted the taking of her deposition and the inspection of her time records, resulting in hearings and orders regarding discovery motions. The trial court explained that Sklar's deletion of her electronic records and periodic "scrubbing" of the underlying metadata justified an inspection of her computers, but Sklar's "furious effort to resist this procedure" led to her violation of two court orders. Sklar's final fee petition in October 2009 (the petition before the court) requested a lodestar amount of $12,079,543.69, and she also filed a motion for an order directing service of a second class notice to allow her additional costs related to the fee litigation, which the court denied.

The court then compared Sklar's request with Caddell & Chapman's fee amount of $1,125,000 (including expenses). Although the firm did not have to engage in the discovery battle that Sklar experienced, "Ms Sklar brought the firestorm on herself by (1) demanding an initial sum that can be charitably described as unrealistic, (2) refusing

25

to produce information that Toshiba was entitled to have, and (3) failing to preserve—and perhaps willfully destroying—underlying time records." (Fn. omitted.) The court had "great difficulty" accepting Sklar's reported hours as accurate, and declined to award a multiplier for "'fees on fees.'" "[T]he class realized no benefit at all from the fee litigation of this case."

Sklar had also "relinquished her entitlement to a fee" by her unprofessional misconduct, including: refusal to provide straight answers to the court's questions; refusal to cooperate in discovery; fighting legitimate efforts by Toshiba to confirm her time; making unfounded accusations against Toshiba and its counsel; and providing a "moving target that constitutes Ms. Sklar's fee request," eventually asking Toshiba to pay her $5.4 million for the fee litigation, during which period she *reduced* her initial request for her work on the merits of the class action by almost three-fourths, from $23.5 million to $6.6 million. "Based on the foregoing, as well as the authority in *Serrano v. Unruh*, *supra*, 32 Cal.3d 621, the Court declines to award any fees to SLO for this third phase of the litigation."

The court awarded SLO $176,900 as "the total fees to which it is entitled in this action." Sklar's appeal in No. B227078 followed.

### DISCUSSION

**I.     We grant in part Toshiba's motion to strike and award monetary sanctions against Sklar in the amount of Toshiba's attorney fees related to the motion.**

Sklar's challenges to the court's detailed order are many and varied. Before we address her arguments, we turn to Toshiba's motion to strike portions of Sklar's appellant's appendix and for sanctions against SLO.

Toshiba's motion contends that Sklar has altered the record on appeal in an attempt to "'unjumble'" the time records that the trial court described as unusable, inconsistent and contradictory, incomplete, and unreliable. According to Toshiba, Sklar has reorganized items, omitted items filed in the trial court, and added items not filed in

26

the trial court, all in violation of California Rules of Court, rule 8.124(g). Toshiba discovered these discrepancies while preparing its respondent's brief.[16]

A declaration by Toshiba's counsel attached to the motion explains that the discrepancies appear in exhibit 121 to Sklar's October 2009 fee petition. The petition states that exhibit 121 consists of true and correct copies of the time records for all attorneys and staff at SLO. Exhibit 121, as it appears in Sklar's appellant's appendix, spans more than 2000 pages.[17] Toshiba found discrepancies between the exhibit 121 Toshiba received with service of the fee petition and the version contained in the appendix. To ensure that these discrepancies also appeared in the version of exhibit 121 in the trial court's file, Toshiba's counsel traveled to the trial court and reviewed the record on file. Toshiba's counsel verified that as exhibit 121 appeared in the court file, Sklar's time records and those of her staff were not organized by person or chronology; in Sklar's appendix, the exhibit is organized chronologically and by timekeeper. The exhibit 121 in the appendix deleted some overlapping time records, and added nearly 100 pages of handwritten time records which did not appear in the court file, all apparently for Sklar's assistant Richard Goldstein. Toshiba requests that we strike the inconsistent portions of exhibit 121from Sklar's appendix, and that we impose monetary or other sanctions, up to dismissal of Sklar's appeal. Counsel's declaration includes the amount of attorney fees incurred in reviewing the record in the trial court and preparing the motion.

Sklar responds, "there is no issue with Exhibit 121," and argues that the time records were not jumbled or disorganized as presented to the trial court. She claims that her paralegal Susan Goldstein prepared a copied exhibit 121 without changing, altering or deleting anything, but "inadvertently" included 96 pages of handwritten time records for Richard Goldstein (Sklar states she will not cite to those records). She points out that

---

[16] Toshiba notes the discrepancies in a footnote in its brief.

[17] Sklar's appellant's appendix in her appeal of the fee order is 103 volumes and 25,189 pages. The purported exhibit 121 runs from volume 76, page 19020 to volume 83, page 21179, for a total of 2,159 pages.

some of the records Toshiba states were not included in exhibit 121 as it appears in the appendix appear elsewhere, with different captions, and two others "are not pertinent to the issues raised by [Sklar] on appeal." She argues that Toshiba should have submitted a certified copy of the multiple volumes of exhibit 121 as contained in the court file, and should have provided a listing by Bates numbers as they appear in the court file. Toshiba's response includes, attached to a declaration by counsel, a table comparing exhibit 121 as it appears in the court file and as it appears in Sklar's appendix. Many parts of the exhibit do not have Bates numbers.

California Rules of Court, rule 8.124(g) is entitled "Inaccurate or noncomplying appendix," and states: "Filing an appendix constitutes a representation that the appendix consists of accurate copies of documents in the superior court file. The reviewing court may impose monetary or other sanctions for filing an appendix that contains inaccurate copies or otherwise violates this rule." For all its bluster and obfuscation, Sklar's response acknowledges that there are differences between exhibit 121 as it appears in the court file and the version before us. It is Sklar's responsibility to provide an accurate appellant's appendix, and she has failed to do so *at least* to the extent identified in Toshiba's motion.

We therefore strike the 96 pages of Richard Goldstein's handwritten records, as they were not included in the court file. (*The Termo Co. v. Luther* (2008) 169 Cal.App.4th 394, 404.) The other inconsistencies in the appearance of exhibit 121 (reorganization, deletion of overlapping records), while extremely troubling, do not require that we strike the over 2000 pages of the appellant's appendix. In resolving this appeal, as explained below, we conclude that the trial court did not abuse its discretion in denying Sklar's fee request. We reach that conclusion after reviewing exhibit 121 and agreeing with the trial court that it is a disorganized jumble, even as it appears in the record on appeal, so that any reorganization attempted by Sklar was fruitless. We conclude that Toshiba is entitled to monetary sanctions on appeal in the amount of its attorney fees related to the motion to strike and Toshiba's reply in support of the motion, as determined by the trial court on remand. (See *Keitel v. Heubel* (2002) 103

28

Cal.App.4th 324, 342 [courts may consider the amount of attorney fees on appeal in determining monetary sanctions].)

## II.     The trial court acted within its discretion in awarding sanctions.

"The court may impose a monetary sanction ordering that one engaging in the misuse of the discovery process, or any attorney advising that conduct, or both pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct . . . . If a monetary sanction is authorized by any provision of this title, the court shall impose that sanction unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust." (§ 2023.030, subd. (a).)  Misuse of the discovery process includes disobeying a court order to provide discovery, and failing to meet and confer in good faith to resolve a discovery dispute when required by statute to do so.  (*In re Marriage of Michaely* (2007) 150 Cal.App.4th 802, 809; § 2023.010, subds. (g), (i).)

We review the order imposing the sanction for an abuse of discretion, and we resolve any evidentiary conflicts most favorably to the trial court's ruling, reversing "only if the trial court's action was ""'arbitrary, capricious, or whimsical.'"" [Citations.]" (*Sinaiko Healthcare Consulting, Inc. v. Pacific Healthcare Consultants* (2007) 148 Cal.App.4th 390, 401.)  Sklar has the burden to demonstrate that the trial court erred, and where the evidence is in conflict we will not disturb the trial court's factual findings.  (*Ibid.*)  Sklar's intent is not relevant to the propriety of the monetary sanctions.  "'There is no requirement that misuse of the discovery process must be willful for a monetary sanction to be imposed.' [Citations.]" (*Clement v. Alegre* (2009) 177 Cal.App.4th 1277, 1286.)  "'Whenever one party's improper actions—even if not "willful"—in seeking or resisting discovery necessitate the court's intervention in a dispute, the losing party presumptively should pay a sanction to the prevailing party. . . .'" (*Id.* at pp. 1286–1287.)

Sklar's conduct, as detailed above, amply supports the sanctions award.  There is no question that she disobeyed the court's August 15, 2007 order that she allow Toshiba's expert to search her hard drive, and its further order on June 24, 2008 setting the inspection for July 22 and 23, 2008.  On the day before the court-ordered inspection

was to begin, Sklar indicated she would not allow it to proceed. While the record is rife with evidence supporting a conclusion that Sklar's disobedience and her misuse of the discovery process were willful, her intent is irrelevant to our conclusion that she defied the court's order and "'presumptively should pay a sanction to the prevailing party.'" (*Clement v. Alegre*, *supra*, 177 Cal.App.4th at pp. 1286–1287.)

Sklar admits that she refused to allow the ordered inspection to occur, but argues that her refusal was substantially justified as her hard drive contained privileged material. The trial court, however, entered a stipulated protective order providing that the production of any electronic information did not waive any of the producing party's claims of privacy, confidentiality, or privilege, and the court made it clear that no privileges were waived. Sklar also argues that the court had no authority under section 2023.030 to order a forensic inspection. The court did not order the inspection as a sanction under section 2023.030. Sklar next argues that she learned only two days before the inspection in July 2008 that Toshiba's expert would image her hard drive. This ignores that Sklar's initial protocol, attached to an email from her counsel on October 19, 2007, began with the creation of a forensic image of Sklar's hard drive (albeit performed by SLO and subject to examination at Sklar's home office).[18] The protocol also provided for the presence of Toshiba's counsel at the inspection of the imaged hard drive by Toshiba's expert, as well as Sklar, SLO's counsel, and an SLO expert.[19] Sklar's protocol provided that the imaged hard drive would be an exact duplicate of her hard drive, so the image would be the same regardless of which party took the image. None of Sklar's

---

[18] The imaging of a hard drive is a first step in attempting to retrieve discoverable data that has reportedly been removed or destroyed. (See, e.g., *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1169–1170 [describing plaintiffs' imaging and inspection of hard drives for data after defendants intentionally destroyed emails using "wiping" software].)

[19] As we noted above, the protocol attached to Sklar's August 2008 declaration (and which she incorrectly described as her original protocol proposed on October 19, 2007) *excluded* Toshiba's counsel from being present at the inspection.

arguments constitutes substantial justification for her disobedience of the court order that Sklar allow Toshiba's expert to inspect her hard drive.

As the trial court said with some exasperation at the April 24, 2009 hearing on Toshiba's motion for sanctions, after Sklar argued that the lack of an ordered protocol substantially justified her disobedience of the court order requiring inspection, "the record in this case is one of obfuscation and delay by [Sklar]." We agree. The record as we have described it above shows that Sklar did not cooperate in creating a protocol, and "strongly indicates that the purpose [of Sklar's behavior] was . . . to generally obstruct the self-executing process of discovery." (*Clement v. Alegre*, *supra*, 177 Cal.App.4th at p. 1292.) That she disputed details of the protocol (while failing to negotiate with Toshiba) does not provide substantial justification for her open defiance of a court order requiring inspection. "The trial court could look at the whole picture of the discovery dispute and was well within its discretion in rejecting [Sklar's] claim of substantial justification." (*Ibid.*) We conclude the court acted within its considerable discretion in imposing sanctions based on Sklar's "[m]isuse[] of the discovery process." (§ 2023.010, subd. (a).)

This brings us to the second basis for the sanctions. While Sklar's refusal to obey the court's order to allow inspection by Toshiba's expert is sufficient to support the sanctions award, we also conclude that the court did not abuse its discretion when it based its sanction order in part on Sklar's failure to meet and confer with Toshiba regarding both of the court-ordered inspections. Section 2023.020 requires the court to "impose a monetary sanction ordering any party or attorney who fails to confer as required pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct." Although the discovery statutes expressly require that a party "meet and confer" before filing certain discovery motions (§§ 2030.300, subd. (b), 2031.310, subd. (b)(2)), there is no statutory requirement at issue in this case. Instead, the trial court repeatedly directed the parties to cooperate in creating an acceptable protocol for the inspection of Sklar's electronic records. The record shows that while Toshiba repeatedly attempted to discuss a protocol for the inspections, Sklar did not

31

reciprocate in a constructive fashion. This failure to engage in cooperative discussion regarding a protocol resulted in the lack of any agreed-upon procedure for the July 2008 inspection by Toshiba's expert. "'[A] reasonable and good faith effort at informal resolution entails something more than bickering with [opposing] counsel . . . . Rather, the law requires that counsel attempt to talk the matter over, compare their views, consult, and deliberate.' [Citation.]" (*Clement v. Alegre*, *supra*, 177 Cal.App.4th at p. 1294.) Sklar cannot rely on the absence of a detailed protocol—an absence to which she contributed by failing to meet and confer with Toshiba—as substantial justification for disobeying the court order to allow the inspection.

"A court's decision to impose a particular sanction is 'subject to reversal only for manifest abuse exceeding the bounds of reason.' [Citation.]" (*Electronic Funds Solutions v. Murphy*, *supra*, 134 Cal.App.4th at p. 1183.) The trial court's decision to sanction Sklar in the amount of $165,000 was not outside the bounds of reason.[20]

## III. The trial court did not act in excess of its jurisdiction in making the inspection orders.

Sklar also argues that the trial court abused its discretion in entering the inspection orders of August 15, 2007 and June 24, 2008, so that the award of sanctions for disobedience was also an abuse of discretion. Even if the court's orders were an abuse of discretion that does not excuse Sklar's disobedience of the orders. "In contrast to orders entered "'in excess of the jurisdiction of the issuing court'" [citation], which may be challenged collaterally, a party may not defend against enforcement of a court order by contending merely that the order is legally erroneous. [Citation]." (*Wanke, Industrial, Commercial, Residential, Inc. v. Keck* (2012) 209 Cal.App.4th 1151, 1172 (*Wanke*); see *In re Marriage of Niklas*, *supra*, 211 Cal.App.3d at p. 35.) Sklar was bound to obey the order to allow the inspection of her hard drive ""however erroneous the action of the court may be,"" as "'[a]n erroneous order . . . is not necessarily an order in excess of the

---

[20] We note that the court scrupulously avoided awarding sanctions related to metadata.

32

issuing court's jurisdiction, as an order that is unconstitutional on its face would be.'" (*Wanke*, at pp. 1172–1173, italics omitted.)

Sklar also argues that the court had no statutory authority to make the order as she was a "non-party attorney" (despite her express acknowledgment in 2008 that Judge Mohr had already issued some discovery orders and had jurisdiction over all disputes),[21] and that the court similarly lacked authority as the order would have forced her to disclose privileged information (despite the stipulated protective order). These arguments do not challenge the court's jurisdiction but restate Sklar's contention that the court erred, and even if her arguments had some validity, "demonstrating that the trial court *erred* in issuing the [order] would not be sufficient to demonstrate that the court acted in 'excess of its jurisdiction' in doing so. [Citations.]" (*Wanke*, *supra*, 209 Cal.App.4th at p. 1178–1179.)

Further, the sizeable nature of Sklar's fee request and her resistance to the court's inquiries regarding her seemingly excessive rates made the court's inspection orders reasonable and necessary. Sklar requested over $24 million in attorney fees. In support, she provided hard copies of her billing records purporting to show that she worked at a superhuman rate, followed by a CD with PDF copies of those time records (which she acknowledges had been redacted). Sklar later represented that she had deleted all the original electronic billing records that arguably might have cast doubt on the accuracy of her billing. We therefore reject Sklar's complaint that the court exceeded its jurisdiction when it authorized Toshiba's inspection of her hard drive to determine whether any of that electronically stored information survived her destruction of the files.

## IV. The trial court acted within its discretion in denying Sklar attorney fees.

"Except as provided for by statute, compensation for attorney fees is left to the agreement of the parties. (Code Civ. Proc., § 1021.) Civil Code section 1717 . . . provides that reasonable attorney fees authorized by contract shall be awarded

---

[21] Section 1985.8, effective in 2009, provides for the use of subpoenas in obtaining electronically stored information from nonparties.

to the prevailing party as 'fixed by the court.' The trial court has broad discretion to determine the amount of a reasonable fee, and the award of such fees is governed by equitable principles. [Citation.] The first step involves the lodestar figure—a calculation based on the number of hours reasonably expended multiplied by the lawyer's hourly rate. 'The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided.' [Citation.] In short, after determining the lodestar amount, the court shall then '"consider whether the total award so calculated under all of the circumstances of the case is more than a reasonable amount and, if so, shall reduce the [Civil Code] section 1717 award so that it is a reasonable figure."' [Citation.]" (*EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 774 (*EnPalm*), citing *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1094–1096.) Although Sklar variously characterizes her fee request as under the Consumers Legal Remedies Act, Civil Code section 1780, and the private attorney general statute, Code of Civil Procedure section 1021.5, as well as a contingency fee, her entitlement to fees is contractual, grounded in the settlement agreement's provision that Toshiba will pay reasonable attorney fees and costs to class counsel.

"'"'The standard of review on issues of attorney's fees and costs is abuse of discretion. The trial court' decision will only be disturbed when there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice."'" (*Pellegrino v. Robert Half Internat., Inc.* (2010) 182 Cal.App.4th 278, 288–289.) As with all orders and judgments, this fee order "is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance." (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 765–766). "[A]scertaining the fee amount is left to the trial court's sound discretion. (*Ketchum* [*v. Moses* (2001) 24 Cal.4th] at p. 1132; *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1252. . . .) Trial judges are entrusted with this discretionary determination because they are in the best position to assess the value of the professional services rendered in their courts. (*Ketchum* [*v. Moses*, *supra*, 24 Cal.4th] at p. 1132; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095–1096); see *Melnyk v.*

34

*Robledo* (1976) 64 Cal.App.3d 618, 623 ['trial court has its own expertise' on the question of fees].)" (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1321.) Thus, the court's fee award "'will not be disturbed unless the appellate court is convinced that it is clearly wrong.'" (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49.)

"'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under the review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.]" (*Cellphone Termination Fee Cases* (2009) 180 Cal.App.4th 1110, 1118.)

### A.     The trial court applied the correct legal standard, and decided that Sklar was not credible and her time records were not usable to calculate a lodestar.

Sklar argues that the trial court did not use the lodestar method in deciding what fees Sklar was due under the terms of the settlement agreement. The trial court's opinion, however, discusses the lodestar method in detail, but concluded that Sklar's billing records were "unusable" for the purpose of calculating the lodestar. The records were inconsistent, contained omissions, and billing entries were inaccurate and even contradictory. The number of hours claimed were excessive (over five years, about 11 hours a day every day for Sklar and SLO), and Sklar's hours included activities that should have been handled by an expert witness, fact investigator, or paralegal. The court applied the negative inferences in CACI No. 203 and 204, but even without those negative inferences, the court concluded that it would have to use "speculation and guesswork to figure out her lodestar for the merits phase."

"The value of legal services performed in a case is a matter in which the trial court has its own expertise," and although properly claimed costs and fees are prima facie evidence that they were necessarily incurred, "where the items are properly objected to, they are put in issue, and the burden of proof is upon the party claiming them as costs." (*Melnyk v. Robledo*, *supra*, 64 Cal.App.3d at pp. 623–624.) Toshiba objected to Sklar's fee request, putting her records in issue. The trial court resolved the conflict in the

evidence in favor of Toshiba, concluding that Sklar had not met her burden to produce accurate time records. Rather than ignoring the lodestar method, the court found that it had insufficient credible evidence of Sklar's time *even to apply* the lodestar method, which begins with the number of hours counsel reasonably expended on the litigation. (*EnPalm*, *supra*, 162 Cal.App.4th at p. 774.)[22] While Sklar vigorously disputes the trial court's conclusion, "we do not reweigh the evidence" in considering whether the trial court abused its discretion. (*Weber v. Langholz* (1995) 39 Cal.App.4th 1578, 1587.)

We also emphasize that the court found that the contradictory and multiple billing "destroys Ms. Sklar's credibility" as to the hours she claimed to have spent during the entire litigation: the merits phase preceding the settlement, the phase during which the parties sought preliminary approval, and the fees phase. The court concluded that it could not trust Sklar's time records during any of those periods. Further, Sklar had "concealed and destroyed evidence" of the time she actually spent on the case, leading the court to believe that the missing records would show a lesser amount of time. The trial court stated that Sklar had not been truthful about the amount of fees (approximately $24 million) she initially requested; engaged in "dissembling and outright distortions;" and concealed and destroyed evidence, so that the court was left with "lingering skepticism over the veracity of her testimony and her evidence." This constitutes a clear adverse credibility determination. The trial court decided against Sklar because it did not believe her evidence of time spent in the class action litigation.

Such a credibility determination is uniquely the province of the trial court. Just as we may not reweigh the evidence, we do not reassess credibility determinations, as "'[t]he Court of Appeal is not a second trier of fact . . . .' [Citation.]" (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531; *Estate of Young* (2008) 160 Cal.App.4th 62, 76.)

_____

[22] Even a court that has been able to calculate a lodestar figure is entitled to reduce the sum under applicable equitable principles. (*EnPalm*, *supra*, 162 Cal.App.4th at p. 778 [trial court's use of equitable principles to reduce lodestar amount by 90 percent "because most of those fees were unnecessary was proper"].)

## B.   *The trial court cited other reasons for denying the fee award.*

The trial court also compared Sklar's initial request of over $24,740,000 to the less than half that amount ($12,079,534.69) she requested in the April 2010 fee petition, and stated:  "[A] court would be justified in denying outright SLO's fee request for this reason alone."  In *Serrano v. Unruh*, *supra*, 32 Cal.3d at p. 635, the California Supreme Court stated:  "A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether.  'If . . . the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked in the first place.  To discourage such greed, a severe reaction is needful . . . .' [Citation.]"  (Fn. omitted.)  (See *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 990.)

Sklar's initial fee request for more than $24,740,000 was calculated based on a percentage of an expert's declaration estimating the value of the settlement.  By the time she made her final fee request, Sklar had withdrawn the declaration, and her final request was based on the lodestar method.  As the trial court recognized, a percentage of the recovery analysis may be used to "cross check" a lodestar amount, but it does not substitute for determining a lodestar.  """Under certain circumstances, a lodestar calculation may be enhanced on the basis of a percentage-of-the-benefit analysis.  [Citation.]" [Citation.]'  [Citation.]  This approach 'anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary.'  [Citation.]"  (*Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 556–557.)  When she withdrew her expert's declaration, the basis for Sklar's outsize initial request disappeared.  As that initial request was based on a percentage of the recovery, we decline to compare it directly to the lodestar amount that Sklar eventually claimed.

While we agree with the trial court that Sklar's requested fee amount was a moving target, casting doubt on her entitlement to fees, the trial court cited Sklar's

37

inflated fee request as only one of several reasons for denying a fee award. We therefore need not consider whether this alternate ground for denying fees to Sklar would alone support the trial court's order.

The trial court also found that Sklar made numerous unfounded accusations of unethical behavior against other participants in the litigation, including Caddell & Chapman and Toshiba's counsel, among others, and cited to the record in support. We need not rely on this ground, but we note that Sklar continues this conduct on this appeal.[23]

### C. *Sklar's other contentions are without merit.*

Sklar protests the court's refusal to apply a multiplier to her fee request for the litigation over attorney fees ("fees on fees"), but the court concluded that the litigation over her fee request provided no benefit to the class and that no multiplier was required. This was not an abuse of discretion (*Pellegrino v. Robert Half Internat., Inc.*, *supra*, 182 Cal.App.4th at p. 295), and, at any rate, as the court concluded that there was not credible evidence supporting a lodestar amount, it is irrelevant whether a multiplier was appropriate. The same applies to Sklar's argument that the court improperly reduced her hourly billing rate; because no fees were awarded, the rate reduction is not in issue. Sklar contends that the trial court abused its discretion in considering the declaration of Toshiba expert William Rubenstein, citing to materials regarding his participation in

---

[23] The court acknowledged that Sklar had also accused the court and its staff, but recognized that it could not consider those accusations, as "[i]t is improper to retaliate against an attorney who attempts to disqualify a judge." We note that in her opening brief on appeal, Sklar accuses Toshiba of entering into the fee agreement with Caddell & Chapman to exploit Sklar and limit her fee award, colluding with Caddell & Chapman ("turncoat co-counsel") to minimize the value of the settlement, and trying to cut Sklar and the named plaintiff out of the case altogether. In her 110-page reply brief, she repeatedly accuses Toshiba of misrepresenting the record on appeal, and accuses Caddell & Chapman of unprofessional conduct, including disregarding its fiduciary duty to the class. She also requests that we assign the case to a different trial court on remand, contending that the "court made no attempt to apply the scales of justice equally between the parties and due process required no less."

other cases.  We denied Sklar's motion to take judicial notice of those materials and therefore do not address this claim.

Sklar also argues that the trial court abused its discretion in applying CACI Nos. 203 and 204 because there was no evidence that she willfully suppressed evidence.  To the contrary, as described above, the record shows that Sklar repeatedly resisted discovery of her original time records, and we will not disturb the trial court's compliance with Evidence Code section 412, which states:  "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with mistrust."  "If stronger evidence is clearly available, the trial court may draw the inference offered by . . . section 412, and view the proffered evidence with distrust." (*Houghtaling v. Superior Court* (1993) 17 Cal.App.4th 1128, 1137.)

Sklar contends that the court abused its discretion in excluding the two boxes of handwritten time records that she produced during the two days of her deposition in June 2009.  As we explained above, Toyota argued that it had sought those records since 2006, and after a hearing the court ordered Sklar to bring the originals to her resumed deposition in September 2009, warning that if she did not proceed with the deposition she would be barred from using those documents in support of her fee petition.  Sklar did not appear for her deposition and did not produce the original documents.  The court did not abuse its discretion.

Sklar argues that the trial court's denial of fees is a constructive sanction, motivated by "subjective reasons" including antipathy toward Sklar and a desire to punish, and the fee order is not based on the evidence.  To the contrary, the fee order as described above shows the trial court's careful consideration of the evidence; it was not required to conclude that Sklar's evidence was reliable.

Sklar also challenges the trial court's order that Sklar's communication with the class go through the claims administrator.  She does not support that claim with any reasoned argument, and we therefore do not address it.  "We are not bound to develop appellants' arguments for them.  [Citation.]  The absence of cogent legal argument or

citation to authority allows this court to treat the contentions as waived. [Citations.]" (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

Sklar argues that the trial court abused its discretion in failing to rule on her evidentiary objections. At the hearing on the fee petition, the trial court commented that Sklar's objections were "so prolix that I can't promise you I'm going to be able to get through them," and directed Sklar to identify the most important objections and schedule a hearing. The trial court was within its discretion to order Sklar to focus on those objections that were important to her case. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532–533.) Sklar never pruned her objections or requested a hearing, instead electing not to file any more evidence and requesting that the matter be submitted. She therefore waived her evidentiary objections.

## V.     The court did not rule on Sklar's request for costs.

The settlement agreement provided: "The maximum amount of fees and expenses to be sought by Sklar Law Offices shall be set forth in the Class Notice."[24] The class notice stated, "Sklar Law Offices will also ask for litigation expenses in the amount of $114,900." Sklar's January 2008 fee petition requested costs of $410,383.53, and her October 2009 fee petition sought costs of $905,572. The trial court ruled against Sklar's November 2009 motion for a second class notice to set forth the increased expense request.

At the February 10, 2010 hearing, the court stated: "I am very hard put to figure out how you could be awarded any more costs based on the agreement that limits you." At the hearing on April 5, 2012, the court referred to the settlement and the class notice as limiting Sklar's expense amount. The court's order denying fees states: "Ms. Sklar also filed a motion for an order directing service of a second class notice by email. She

---

[24] The settlement agreement also states: "Sklar Law Offices agrees that it will not seek any additional fees or expenses from [Toshiba] in connection with the action and the settlement set forth herein that are not part of its Fee Application, including, without limitation, any fees or expenses incurred in connection with obtaining final approval of the settlement, in connection with any objection(s) or appeal(s), in connection with and throughout the claims administration process, expert fees, or other fees or expenses."

did so in order to recover additional costs that she claims to have incurred because of the intensity of the litigation surrounding her attorney's fee application. The Court denied the motion because Ms. Sklar's costs were limited by the settlement agreement, a contract she expressly agreed to." The trial court did not, however, address whether Sklar was entitled to recover all or any part of the $114,900 as set forth in the class notice.

Toshiba argues on appeal that the "disarray" of Sklar's documentation in support of her costs justified denying her request for costs, and the majority of Sklar's claimed costs were not recoverable. While the court denied her request to send a new class notice with the increased cost amount (therefore limiting her costs to the $114,900 appearing in the initial class notice), it did not rule on her cost request. The state of the supporting record, and whether that record supports an award of costs in any amount, is for the trial court to determine in the first instance. We therefore remand to the trial court to rule on Sklar's request for costs, in light of the settlement agreement, the class notice, and her subsequent fee petitions.

## VI. The trial court acted within its discretion in awarding $176,900 in fees for work by SLO staff.

The trial court's June 20, 2010 order states: "The court can calculate a lodestar for SLO's staff because their time records appear to be in order. Susan Goldstein devoted 1,385 hours to the merits phase at a stated hourly rate of $100. Richard Goldstein devoted 354 hours to the merits phase at a stated hourly rate of $100.[25] Missy Mouser devoted 30 hours to the merits phase at a stated hourly rate of $100. The SLO staff claims to have billed 1,769 hours at $100 per hour for a total lodestar of $176,900. Declining to apply a multiplier to the services of SLO's staff produces a total fee for SLO's work during the merits phase [in] the sum of $176,900." Toshiba cross-appeals, arguing that no fees should have been awarded for the work of the SLO staff.

---

[25] Of course, the trial court did not have before it Richard Goldstein's handwritten records, which as explained above we strike from the record on appeal.

First, Toshiba points out that 24 hours of Missy Mouser's time was incurred in May 2006, so that she devoted only 6 hours to the merits phase (October 2004 to April 2006) rather than 30, as the order states. This is a simple calculation error which the court can correct on remand by subtracting $2,400 from the fee award.

Second, Toshiba argues that SLO's staff are not qualified paralegals under California law, and therefore the trial court erred in awarding fees for their work. As in the trial court, Toshiba opposes the award of fees on the ground that Sklar's staff were not paralegals pursuant to Business and Professions Code section 6450. Sklar replies (as she did in the trial court) that her staff were paralegals under Minnesota requirements, complied with California's continuing education requirements, and their billing rate of $100 was less than one-half of the rate at which Toshiba's counsel billed its paralegal time.

Business and Professions Code section 6450, subdivision (c), sets forth the required qualifications for paralegals under California law.[26] Toshiba points out that none of Sklar's staff possessed a certificate of completion from a paralegal program; neither Susan nor Richard Goldstein had a baccalaureate degree; none obtained three years of law-related supervised work before December 31, 2003; and Sklar did not

---

[26] As in effect during the merits phase, Business and Professions Code section 6450, subdivision (c) provides: "A paralegal shall possess at least one of the following: [¶] (1) A certificate of completion of a paralegal program approved by the American Bar Association. [¶] (2) A certificate of completion of a paralegal program at, or a degree from, a postsecondary institution that requires the successful completion of a minimum of 24 semester, or equivalent, units in law-related courses and that has been accredited . . . . [¶] (3) A baccalaureate degree or an advanced degree in any subject, a minimum of one year of law-related experience under the supervision of an attorney who has been an active member of the State Bar of California for at least the preceding three years . . . and a written declaration from this attorney stating that the person is qualified to perform paralegal tasks. [¶] (4) A high school diploma or general equivalency diploma, a minimum of three years of law-related experience under the supervision of an attorney who has been an active member of the State Bar of California for at least the preceding three years, and a written declaration from this attorney stating that the person is qualified to perform paralegal tasks. This experience and training shall be completed no later than December 31, 2003."

provide a written declaration that any was qualified to perform paralegal tasks. As authority for the proposition that no fees may be awarded for paralegal work unless the paralegal meets the requirements of the California statute, Toshiba cites two unpublished decisions from federal district courts in California.[27] These cases do not bind us, and in any event they do not hold, and we have found no California state cases holding, that compliance with the educational requirements of Business & Professions Code section 6540 is in every case a prerequisite to the recovery of paralegal fees.

In the face of Toshiba's argument that Sklar's Minnesota staff deserved no compensation on the basis of noncompliance with California's educational requirements for "paralegals," the court nevertheless awarded fees for the work of Sklar's "staff." Nowhere in the trial court's order awarding fees does the court state that Sklar's staff were paralegals, or that the $176,900 awarded was for the work of paralegals. "The trial court is in the best position to determine the reasonable value of professional services rendered in a case before it and has broad discretion to determine the reasonable amount of an attorney fees award." (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 159.) Further, on appeal we presume the trial court's order is correct, indulge all presumptions in favor of that correctness, and resolve all ambiguities in favor of affirmance. (*Hirshfield v. Schwartz*, *supra*, 91 Cal.App.4th at pp. 765–766.) In this case, the trial court concluded that reimbursement at a rate of $100 an hour was appropriate for Sklar's staff *without* either stating that they were paralegals or stating that $100 an hour was a paralegal rate. We presume (in favor of the order's correctness) that the trial court did not consider the staff to be "paralegals" and did not consider $100 an hour to be a

_____

[27] In *Sanford v. GMRI, Inc.* (E.D.Cal. Nov. 11, 2005, CIV-S-04-1535 DFL CMK) 2005 U.S.Dist. Lexis 27581, the plaintiff sought to recover paralegal rates for individuals who were previously categorized as legal assistants and who did not meet the requirements of the statute; the trial court required that those individuals be compensated as legal assistants. In *Velez v. Roche* (N.D.Cal. Sept. 22, 2004, No. C-02-0337 EMC) 2004 U.S.Dist. Lexis 29848, *33–*34, the court awarded fees for paralegals who met the requirements of the statute. In both cases, of course, the federal district court was making the decision in the first instance of the rate to be used, just as the trial court did in this case. Our appellate review, by contrast, is for abuse of discretion.

paralegal rate. We cannot say it was an abuse of discretion to award fees for the work of SLO's staff.

Third, Toshiba argues that the records for SLO staff time suffered from the same defects as Sklar's time records. The trial court, however, while it concluded that it could not calculate a lodestar from Sklar's time records, found that the staff's records were "in order."[28] Just as it was not an abuse of discretion for the trial court to conclude that Sklar's time records were so hopelessly duplicative, contradictory, and unreliable that it could not calculate a lodestar, it was not an abuse of discretion for the court to conclude that the records of staff time were sufficiently coherent to serve as a basis for calculating a fee award for staff time.

Sklar's reply brief argues that the court should have awarded fees for "paralegal services" for the entire litigation and erred in calculating Susan Goldstein's hourly rate. Those arguments are meritless in light of our conclusion above that the award was not for "paralegal services." Further, the court concluded that no fees were appropriate for the latter stages of the litigation, because the class received no benefit from Sklar's objections to the settlement or from the attorney fees litigation. The appellate record amply demonstrates that the court's conclusion was within its discretion.

---

[28] We have reviewed the records and do not conclude that they are so in disarray as to preclude the trial court from relying on them to make the award of fees for the work of Sklar's staff.

## DISPOSITION

The order awarding monetary sanctions is affirmed.  The portion of the attorney fee order awarding $179,600 in fees for work by Sklar Law Offices staff is reversed, and is remanded to the trial court for correction of the amount of fees due for the work of Missy Mouser, and for a determination by the trial court of the amount, if any, of costs to be awarded to Sklar Law Offices, with a maximum cost award of $114,900.  The trial court is also directed to award monetary sanctions to Toshiba America Information Systems in the amount of its attorney fees and costs related to Toshiba America Information Systems's motion to strike.  In all other respects, the attorney fee award is affirmed.  Costs on appeal are to be awarded to Toshiba America Information Systems. Pursuant to Business and Professions Code section 6087, subdivision (a)(3), the clerk of this court is directed to send a certified copy of this opinion to the State Bar.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.


CHANEY, J.


45