Filed 8/28/14  Kaufman v. Bd. of Civil Service Commissioners of LA CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LAWRENCE KAUFMAN, | B250155 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No.  BS134938) |
| v. | |
| BOARD OF CIVIL SERVICE COMMISSIONERS OF THE CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Luis A. Lavin, Judge.  Affirmed.

DePasquale & Cole, Russell J. Cole and Paul R. DePasquale for Appellant.

Michael N. Feuer, City Attorney, Zna Portlock Houston, Assistant City Attorney and Janis Levart Barquist, Deputy City Attorney for Respondent.

_____

Lawrence Kaufman appeals from the judgment upholding the Los Angeles Police Department's decision to fire him from his civilian technical support job due to insubordination and other misconduct. We reject his contentions that there was insufficient evidence to support the misconduct charges and that his due process rights were violated because he was not given sufficient notice of the charges and the evidence against him. We therefore affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

1. *Events Leading to Kaufman's Discharge*

In September 2005 the Los Angeles Police Department fired information technology support staff employee Lawrence Kaufman based on five charges of misconduct and insubordination. Kaufman filed a civil service challenge to that decision, leading to an eight-day hearing where three of the charges were eventually upheld.[1]

Kaufman was hired to work on the department's information technology support staff in July 2001 and almost immediately became a problem employee. His supervisor, Richard Davis, began receiving reports of offensive comments involving religious, ethnic, and sexual harassment within Kaufman's first two weeks on the job. Davis talked to Kaufman about his behavior several times and Kaufman agreed to undergo counseling through the department's Behavioral Services Section. Kaufman then showed improvement and passed probation.

Kaufman's behavior deteriorated after that point, including a "serious incident" where he was rude and offensive to one employee. Davis described Kaufman as a "high maintenance" employee who required a lot of attention. When communicating with other employees, Kaufman "chose arrogance, ridicule, sarcasm to the extent where it was not

---

[1] Our statement of facts is based on the testimony and exhibits introduced in evidence at that hearing. In accord with the applicable standard of review, which we discuss *post,* we state those facts in the manner most favorable to the judgment. (*Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507, overruled on other grounds by *Privette v. Superior Court* (1993) 5 Cal.4th 689, 696.)

understood to be acceptable to the person," Davis said. Davis found Kaufman so difficult to deal with that he placed another employee in between them to supervise Kaufman and act "as a shield" for himself.

In March 2003, in response to further complaints, Davis transferred Kaufman to another section, where he worked under the supervision of Arthur Fong. Fong told Kaufman he came to him with a clean slate, but on his first day there Kaufman triggered a "big argument" by criticizing a co-worker in a "racial manner." Fong tried to work with Kaufman, but Kaufman walked away from meetings, asked "far-out" questions, and sent harassing e-mails, Fong testified. Supervising him became so time consuming that Fong felt drained and almost had a nervous breakdown.

On August 10, 2004, Fong told Kaufman to write an e-mail to an outside computer support vendor with a question about upgrading a server. Fong asked Kaufman to prepare the e-mail because Fong was in the process of moving to a different cubicle and his computer was not hooked up. Kaufman testified that Fong's request did not make sense, and also believed that Fong was required to first have the vendor open a "new ticket" before the vendor could proceed.[2]

According to Fong, Kaufman returned two or three hours later and said he did not know how to do it. Fong gave Kaufman further instructions and Kaufman returned with a draft addressed to the vendor that read: "Good morning. ITD would like to upgrade the NT 4.0 Teams Web Server to Windows 2003 Server. Our Network Team has built the computer and installed the server software. Can you please provide Our Teams Web support group with assistance to help on how to configure the server to connect to the IBM Mainframe. [¶] Arthur Fong is the lead on this project and has dictated this letter. He has directed me to not botherer [sic] to open a new case, and I am not allowed to question his reasons. I am the middle-man in this endeavor and am only following his directions. [¶] Tanks, [sic] [¶] Larry Kaufman".

---

[2] According to Kaufman a "new ticket" is the way by which work time is tracked.

Fong took a pencil and edited out the typos and misspellings, and in the second paragraph eliminated everything after "Arthur Fong is the lead on this project." He then told Kaufman to re-do the e-mail. Kaufman returned some time later with a new draft that read: "We want to replace our Windows NT server with a Windows 2003 server. Normally we would like to ask our consultant what we are suppose to do, but in this case our Senior Systems Analyst I Arthur Fong is unwilling to do that, and he is unable to explain why he is reluctant. What will it cost to have one of [your] consultant [sic] visit us and make the necessary changes." Fong found that version unacceptable and wrote down the wording he wanted Kaufman to use, which was essentially a request for technical assistance. Fong's version ended by stating that "Arthur is the lead on this project and I am his assistant. Please reply at your earliest convenience."

Fong told Kaufman not to work on any other projects until he sent the e-mail. Later that afternoon, Fong learned that Kaufman had gone to help a co-worker on another project instead of completing the e-mail. Fong called Kaufman into his office to explain, but Kaufman refused to talk unless he tape-recorded the conversation. Fong said he could not do that, but Kaufman tried to record the conversation anyway. Kaufman put his feet on Fong's desk, then crumpled up Fong's handwritten draft and tossed it in a trash can.

The next day – August 11 – Fong saw Kaufman walk in and out of the Field Support Unit office five times.[3] That area was for authorized personnel only and Wanda Owens – who was Fong's supervisor – had previously told Kaufman to stay out of there after receiving complaints from Field Support employees that Kaufman was using their phone. On either August 10 or 11 Field Support employee James Bentley put up a sign stating that only authorized personnel could enter that area. Kaufman asked one Field Support employee if she knew who had put up the sign. Another employee later saw Kaufman take it down and throw it away. On August 12, 2004, Fong saw Kaufman

---

**3** Neither the briefs nor the record explain what is the Field Support Unit.

4

trying to enter the Field Support Unit. When Kaufman entered, Fong tried to follow, but Kaufman closed the door in his face.

Based on the e-mail and Field Support Unit entry incidents, Kaufman was suspended from work with pay on August 13, 2004, pending the outcome of an investigation. He was given a written order to stay away from, and not communicate with, the department until cleared to return to work by a department psychologist. That decision was made by Peter Di Carlo, the assistant commanding officer of the department's information and communications services bureau.

One department psychologist cleared Kaufman to return to duty on August 14, but another told Di Carlo that Kaufman should remain at home. Di Carlo decided to have Kaufman stay at home based on the nature of the charges and the fear among many of Kaufman's co-workers that he might act out violently.

On October 15, 2004, Kaufman called Di Carlo to complain that he was having trouble receiving his paychecks, but ended up talking to Sgt. Michael Barela, who was Di Carlo's aide. During their conversation Kaufman spontaneously asked whether Barela knew what happened when he got upset. When Barela asked what would happen, Kaufman answered, "I kill people. I murder people." Barela thought it was possible that Kaufman had committed a crime and warned him to speak with a lawyer. He then asked where Kaufman had killed people. Kaufman began to back off his remark, said he had just been joking, and assured Barela that he had not killed anyone. Barela prepared a misconduct complaint based on that phone call, which then became part of the investigation into the two August incidents.

By July 2005 the department completed its investigation and determined that Kaufman should be fired not only for the e-mail, unauthorized entry, and threatening phone call incidents, but for two others as well: (1) a June 2004 comment to Field Support Unit employee Kristine Pham that he hated all Vietnamese and Chinese; and (2) a June 2005 incident where he violated the stay away order by contacting department employees.

On July 26, 2005, the department met with Kaufman and presented him a package of documents explaining the charges made and the factual basis behind them, pursuant to *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 (*Skelly*), which establishes the due process notification rights of civil service employees facing disciplinary action.[4]

2.     *Administrative and Judicial Procedural History*

Kaufman challenged his discharge, leading to an eight-day civil service hearing to adjudicate the dispute.  The hearing officer found that the department failed to comply with *Skelly* in regard to the incident where Kaufman told co-worker Pham that he hated all Vietnamese and Chinese people because the *Skelly* notice came more than one year after that incident, and recommended that the Los Angeles City Board of Civil Service Commissioners dismiss that charge.  The hearing officer found that the department complied with *Skelly* in part as to the four remaining charges, and concluded that the partial compliance was adequate.  He found sufficient evidence to sustain those charges and recommended that the discharge be sustained.  In January 2007 the Board adopted the hearing officer's recommendations.

In 2007 Kaufman brought an administrative mandate action to overturn the Board's decision.  In November 2008 the trial court found that the department had complied with *Skelly* and concluded there was sufficient evidence to sustain the discharge, but granted the petition because the hearing officer's written decision did not contain sufficient factual findings.

In the interim, the hearing officer died.  On remand, the Board appointed another hearing officer to handle the case, but gave the hearing officer discretion to determine whether to take new evidence.  The new hearing officer chose to decide the matter based on his independent review of the evidence from the first administrative proceeding.  After doing so, the hearing officer agreed with the earlier rulings that the count related to Kaufman's June 2004 comment that he hated the Vietnamese and Chinese should be

---

[4]     Kaufman challenges the adequacy of the *Skelly* package he received, an issue we discuss in more detail in section 2 of our DISCUSSION *post.*

6

dismissed because the *Skelly* notice came too late. The hearing officer found there was insufficient evidence to support the charge of violating the stay away order, but that sufficient evidence supported the remaining three charges: the e-mail, Field Support Unit entry, and threatening phone call incidents. The hearing officer also found that the department had satisfied *Skelly* as to those charges. He therefore recommended that the discharge be sustained.

The Board adopted the recommendations from the second hearing in January 2011, leading to the second mandate action, which is the subject of this appeal. In November 2013 the trial court denied the petition, finding: (1) no *Skelly* violation; and (2) sufficient evidence to support the three remaining charges and to sustain the discharge.

## STANDARD OF REVIEW

Because Kaufman had a fundamental, vested right to his employment, the trial court was required to exercise its independent judgment and examine the administrative record for errors of law while making its own credibility determinations from the evidence. (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 407.) On appeal, we review the record to determine whether the trial court's findings are supported by substantial evidence. As a result, we draw all legitimate inferences and resolve all evidentiary conflicts in favor of the judgment. (*Id.* at pp. 407-408.) We exercise independent review of the issue whether Kaufman's *Skelly* due process rights were violated. (*Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1275.)

## DISCUSSION

1. *The Judgment Is Supported By Substantial Evidence*

Contrary to fundamental tenets of appellate practice, Kaufman has failed to cite much of the unfavorable evidence set forth above or has done so in a sanitized manner. In essence, he has presented a mostly one-sided version of the facts and asked us to

reweigh the evidence in his favor. We therefore deem waived his substantial evidence challenges to the judgment. (*Gombiner v. Swartz* (2008) 167 Cal.App.4th 1365, 1374; *Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832.) As set forth below, we alternatively hold on the merits that the judgment is supported by substantial evidence.

### A. The August 10 E-mail Incident

Fong's testimony, along with the draft e-mails admitted in evidence, is compelling proof that Kaufman disobeyed an order to send an e-mail requesting technical support from an outside vendor. Kaufman admitted as much, testifying that he did not send the e-mail version Fong wanted because he disagreed with it and did not want to look foolish. Kaufman appears to contend that this somehow justified his refusal to cooperate and send the e-mail, but it merely confirms the charge against him.

Kaufman also denied both crumpling the draft that Fong prepared and tossing it in the trash, and putting his feet up on Fong's desk when Fong questioned him about the e-mail. However, he did admit to taking those actions on other occasions, claiming that Fong told him to put his feet up on his desk. This at most raises an evidentiary conflict that the trial court was free to resolve against Kaufman. Even if those two acts of insolence did not occur, the evidence is still overwhelming that Kaufman disobeyed a direct order to prepare an e-mail request to a vendor.

Finally, Kaufman contends that his failure to prepare and send the e-mail was proper because police administrator Di Carlo testified it was against policy to force an employee to sign his name to an e-mail written by his supervisor. On cross examination Di Carlo was asked whether department policy allowed a manger to "force a subordinate to write a memorandum and sign their name to it?" Di Carlo replied that the employee could write something for the manager's own signature but that having them sign their own name would be inappropriate. On redirect-examination counsel for the Board showed Di Carlo the final e-mail edit made by Fong and asked whether Fong did anything unethical, immoral, or out of policy by telling Kaufman to send that e-mail under Kaufman's name. Di Carlo answered no and agreed it was a valid order.

8

Kaufman never mentions that testimony in his appellate briefs. The answer Kaufman relies upon was given in response to an ambiguous question concerning the authorship of "memoranda." Di Carlo's answer on redirect was in response to the specific e-mail in question and the trial court was free to conclude that the latter testimony was the most applicable. Based on this, we conclude that there was sufficient evidence to sustain the finding as to the e-mail incident of August 10.

B.      The Field Support Unit Entry Incident

Fong and Owens both testified that Kaufman was told not to enter the Field Support Unit, and Kaufman does not deny that he frequently entered that area. He justified his many entries into that area by claiming that Owens merely gave him a verbal order not to bother anyone back there and he did not believe he violated that order because the area was often unoccupied and because when people were there he did not believe he was bothering anyone.

Kaufman claimed that he often entered the Field Support Unit to retrieve tools he needed to perform his work, and that Field Support employee Douglas Hu told Kaufman he could enter the area. Kaufman also claimed that Fong had previously told him it was alright to enter the Field Support Unit and make personal phone calls, but that Fong rescinded that order on August 13, 2004, the day Kaufman was suspended. That came by way of a written order that was dated May 13, 2004, a discrepancy that Fong explained was a clerical error and that Kaufman points to as proof that he was set up and that Fong falsified the evidence against him. Finally, Kaufman admitted tearing down the sign that said only authorized personnel could enter, but believed it had been put up as a joke.

However, as noted, Fong and Owens testified that they had told Kaufman to stay out of that area. Fong also testified that Kaufman did not need to enter the Field Support Unit to retrieve tools. We agree that the August 13 written order carries little weight because it was drafted after the unauthorized entries that led to the discipline, but that does not undercut the effect of the verbal orders that Kaufman received. All together this shows nothing more than a garden variety conflict of evidence that the trial court resolved

9

against Kaufman, expressly finding Kaufman's version of events not credible. We therefore conclude that the evidence supports the trial court's findings regarding this incident.

### C.    Threatening Phone Call Incident

In response to Sgt. Barela's testimony that when Kaufman called about his paycheck he told Barela he was upset and that when he gets upset he kills people, Kaufman claimed that he instead jokingly told Barela: "I'm obviously a serial killer which is why you sent me home." This too presented nothing more than a routine evidentiary conflict that was resolved against Kaufman.

Kaufman also complains that Barela's written complaint – a so-called Form 1.28 – was never produced. According to Kaufman, Barela's notes on that form would have been favorable to him and that under Evidence Code section 412 Barela's testimony should have been viewed with distrust. Assuming for the sake of discussion that Evidence Code section 412 even applies here, it at most creates an unfavorable inference that the trial court had discretion to draw. (*Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 885-886.) The trial court expressly found Kaufman was not credible and we see no reason to disturb its findings.

### 2.    Skelly *Was Not Violated*

Kaufman contends that his *Skelly* due process rights were violated because: (1) a "Ms. Walker" who "apparently" represented the Board admitted as much at the start of the first administrative hearing; (2) statements or reports from the psychologists to whom Di Carlo spoke in deciding whether to let him return to work were not included in his *Skelly* package; and (3) the only Form 1.28 complaint included in his *Skelly* package came from the June 2004 incident where he allegedly said he hated the Vietnamese and Chinese. We take each in turn.

10

A. The Purported Admission By a "Ms. Walker"

Under the Board's civil service rules the first order of business for the hearing officer was determining whether *Skelly* had been complied with. At the start of the first administrative hearing on March 28, 2006, the hearing officer asked whether the parties could stipulate to that fact. The transcript identifies appearances by only two persons: Jeffrey Boxer, who was Kaufman's lawyer, and Myrlin Rebuldela, who represented the department. In response to the hearing officer's question, a person identified by the reporter as Ms. Walker said there could be no such stipulation because of certain defects in the *Skelly* process. The hearing officer said he would have to look into it. The next statement was attributed to Boxer, who argued that some of the charges were brought too late. That is followed by Rebuldela arguing that the department had complied with *Skelly*.

Kaufman contends that "Walker" must have been a department representative and that her statement was an admission that *Skelly* had not been followed. The Board contends that the reference to Walker was a mistake by the reporter, because there was no such person at the hearing and because, as the context shows, the department in fact contended that it had satisfied its *Skelly* obligations.

We agree with the Board. Nowhere else in the record does a Ms. Walker appear. We find it unbelievable that a mystery representative for the department would refuse to stipulate to its own *Skelly* compliance while Rebuldela argued the opposite so strenuously right after that statement was made. The statement attributed to Walker appears to in fact have been made by Kaufman's attorney, Boxer. Finally, any such concession would be meaningless because we independently review whether *Skelly* was satisfied.

B. Psychologists' Reports

Di Carlo spoke to two department psychologists right after Kaufman was placed on leave. One said Kaufman was fit for duty and the other said that even though "there was nothing psychologically based," recommended that Kaufman remain at home.

Kaufman complains that nothing in writing documents those statements, which he contends Di Carlo relied on when "making his decision to terminate" him.

Kaufman mischaracterizes Di Carlo's testimony. The psychologists' statements were used to determine whether Kaufman should stay at home pending the investigation into the charges against him. Anything they said had nothing to do with the investigation or the decision to fire Kaufman that was made nearly one year later. We therefore agree with the trial court's finding that evidence concerning the psychologists' statements was irrelevant to the *Skelly* issue.

### C. Departmental Complaint Forms

When an incident of employee misconduct triggers a complaint, that complaint is documented in a form known as Form 1.28. The *Skelly* package prepared for Kaufman included the Form 1.28 for only the June 2004 incident where he told an Asian co-worker that he hated the Chinese and Vietnamese. Kaufman contends omission of the complaint forms for the other incidents violated his *Skelly* rights.

Under *Skelly*, a civil service employee facing discipline is entitled to notice of the proposed action, the reasons for that action, the materials upon which the action is based, and an opportunity to respond. (*Skelly, supra,* 15 Cal.3d at p. 215.) Due process does not require a full trial-type evidentiary hearing as part of this process. (*Ibid.*) Due process in this context is flexible and does not require the production of every document later offered at the post-termination hearing. (*Gilbert v. Sunnyvale*, *supra,* 130 Cal.App.4th at pp. 1276, 1280.)

In March 2005 the department unit investigating the charges consolidated all the complaint forms into one master complaint. Three months later Kaufman received a 128-page *Skelly* packet that listed all the charges against him, supplied a list of witnesses, and contained investigative reports that set forth the statements of the various witnesses, along with the e-mail drafts from the e-mail incident. We therefore hold that no *Skelly* violation occurred.

12

**DISPOSITION**

The judgment is affirmed.  Respondent shall recover its costs on appeal.


                                                    RUBIN, J.

WE CONCUR:



BIGELOW, P. J.



GRIMES, J.