Filed 6/16/15  Reinecker v. Kast CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| DIANA REINECKER, | B247300 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC115099) |
| v. | |
| KRAIG KAST, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Hart Cole, Judge.  Affirmed.

Kraig Kast, in pro. per., for Defendant and Appellant.

Steven Glaser for Plaintiff and Respondent.

_____

Kraig Kast appeals from a judgment after a court trial awarding Diana Reinecker $38,000.  We affirm.

## BACKGROUND

On December 1, 2011, Reinecker filed a complaint against Kast for injunctive relief and damages for breach of oral contract, unjust enrichment, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, fraud and deceit, negligent misrepresentation, promissory estoppel, unfair competition in violation of Business and Professions Code section 17200,[1] specific performance, and accounting.  The single issue in the case was whether Reinecker and Kast had agreed that Kast would act as the listing agent for a condominium in Santa Monica owned by HSP Ocean Avenue, Inc. (HSP) in exchange for $2,500, with the $38,000 remainder of the sales commission to go to Reinecker.  After a court trial, the court found in favor of Reinecker and awarded Reinecker $38,000.  The court provided a detailed statement of decision, finding Kast's trial testimony to be replete with contradictions and failures of memory and concluding there was a complete lack of evidence that Kast had more than a minimal role as the listing agent.

In addition to disputing Reinecker's representation of the facts of the case, the defense raised two legal arguments.  First, relying on section 10136, Kast argued it was illegal for Graves, an employee of HSP, to prepare the paperwork for the transaction because she was unlicensed and acting as a licensed real estate agent.  The trial court held that since Graves neither brought nor maintained the action, section 10136 is inapplicable.  Second, Kast argued that Reinecker's involvement in the transaction exceeded the allowable scope of a "finder" whose job is limited to bringing the parties together.  During argument, the defense appeared to abandon this argument and the trial court noted this was wisely done.  The trial court held that there was no evidence to

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

suggest that Reinecker became involved in any of the negotiations in any way or acted as anything other than one who brought Kast to Graves. Kast filed this timely appeal.

**FACTS**

The facts are drawn from the trial court's statement of decision and the settled statement on appeal under California Rules of Court, rule 8.837. There is no reporter's transcript.

Kris Graves began working for Hoyt Pardee and his corporation HSP in 1999, when Pardee began a renovation and condominium conversion of 535 Ocean Avenue, a luxury building in Santa Monica. Graves worked closely with Pardee during the renovation and ultimate sale of the units and part of her job included hiring the listing agents and brokers. Graves testified she has never been a licensed real estate agent or broker and always hired the same two women to serve as the listing agents for the sale of the units.

The tenant in unit 7B at 535 Ocean Avenue died in January 2010. The Toubassys, who owned unit 3D, had long expressed an interest in purchasing unit 7B because it was larger and it had a better view. When unit 7B ultimately became available for sale in July 2011, it was understood by HSP that the Toubassys would buy the unit. Despite the simplicity of the transaction, the Toubassys hired a real estate agent to handle the sale, which necessitated the seller hiring an agent, too. Graves knew it would be an easy sale since she would be handling all of the paperwork and she wanted to work out a way so that her sister, Diana Reinecker, would receive cash as a legitimate finder's fee. As an employee of HSP, Graves could not receive a finder's fee herself; she needed to find someone she could trust to step in and identify a listing agent in exchange for receiving a finder's fee. Instead of hiring the two agents who had handled all the other sales for HSP, she sought the help of her sister.

Reinecker testified she contacted Kraig Kast, a licensed real estate agent, about acting as the real estate agent for HSP in the sale of unit 7B. Kast and Reinecker had been romantically involved at one point but had remained friends over the years. Reinecker testified she and Kast agreed that Reinecker would act as the finder and would

3

hire Kast as the listing agent, with a minimal role. Reinecker stated they agreed Kast would keep $2,500 of the $40,500 commission and the balance of $38,000 would be paid to Reinecker. Both Reinecker and Kast had hit hard financial times and this deal would give them each some cash for a minimal investment of time and effort.

Reinecker and Kast did not enter into a signed contract, nor is there any documentation memorializing mutual assent to the alleged agreement or its terms among the numerous emails between them. There is no written contract between Kast and HSP retaining Kast as its listing agent. Graves agreed to prepare all of the transaction documents for the condominium sale in accordance with the deal points directed by her employer, HSP. Reinecker claimed Graves prepared all of the necessary documentation but Kast reneged on the deal and insisted on being paid the full amount of commission when it was time to disburse the commission funds through escrow.

As early as August 3, 2011, Graves asked Reinecker to confirm the $2,500 fee with a signed agreement. On August 4, 2011, Reinecker forwarded a real estate listing agreement form from Graves to Kast. Kast wrote back, "'What am I supposed to do with the agreement? Sign it now, send it back?'" Since Kast did not sign the first listing agreement, Graves emailed Kast another listing agreement form on August 10, 2011 and stated: "'I will take care of all documents and communicating with Escrow and Buyers (sic) Agent. . . . [P]lease do not answer any calls, let it go to voicemail and contact me.'" Kast did not question Graves's orders not to participate in the deal and there is no indication he ever signed a listing agreement. He assured Graves, "'I'm not going to screw you over, you need to trust me.'"

Beginning on August 14, 2011, after escrow had opened, Graves sent Kast a series of disclosure documents that she completed and which required only the listing agent's signature. He signed the documents as requested, although he did so without any due diligence or personal knowledge. Kast testified Graves prevented Kast from being present at the inspection or performing his duties as a licensed real estate sales agent.

Kast testified he did not learn Reinecker was expecting a finder's fee until September 6, 2011. Kast believed she was offering him the opportunity to act as the

4

seller's broker to repay him for the kind things he had done for her over the years and to repay him for the money she owed him, including $1,000 he loaned her in March 2011 to prevent her from being evicted. Kast further testified that the first time he saw a commission agreement was on September 6, 2011. At trial, Kast claimed he never agreed to the nominal sum of $2,500 and he asserted that he legitimately represented the seller, HSP, in this real estate transaction. Kast claimed that since there was no signed contract memorializing the alleged agreement between Kast and Reinecker, he earned and is entitled to the full amount of the commission from the sale of the condominium. Kast admitted, however, that he never signed a listing agreement, never met the seller of the property, and never visited the property.

The first email in which Kast expressed interest in the details of the sale is dated August 16, 2011. In the email, Kast wrote, "I need copies of ALL documents and escrow is giving them to me as they should." By September 3, 2011, escrow was about to close (per stipulation, escrow closed on September 13, 2011) and Kast needed the tax information for each of the individuals that were to receive a commission payment. At this point, according to Graves, Kast began to renege on the alleged agreement and threatened to hold up the close of escrow. This is corroborated by Graves's September 7, 2011 email to Kast in which she wrote, " . . . you would be foolish to ruin a good thing."

Kast did not say anything about his commission until his September 10, 2011 email to Reinecker, in which he wrote, "Please tell your sister that the only commission terms I have agreed to are those in the listing agreement." According to Kast, however he still did not have a signed copy of any listing agreement. All the work had been completed by Graves up to this point, and escrow was due to close soon.

In a contradictory email from Kast dated September 13, 2011, Kast offered to pay a referral fee of 50 percent (or $20,250) to Reinecker once Reinecker provided Kast with the social security numbers or tax identification information for Reinecker and the two other individuals that were to receive a portion of the commission, so he could issue 1099 forms. This was Kast's first mention of a 50-50 split, and he explained the 50-50 verbal agreement to which he had made reference in the September 13, 2011 email was actually

5

an agreement he and Reinecker had made in 2009 regarding an allegedly lucrative sale of property that never went through. Kast felt Reinecker had wasted his time in 2009 when she fabricated a lucrative property sale, so he never discussed a commission split of any sort with her in 2011. When Reinecker refused to give Kast the information he requested, Kast kept the entire $40,500 commission.

Although Kast initially testified he first learned Reinecker was seeking a portion of the commission as a finder's fee on September 6, 2011, Kast subsequently testified that the first time he heard of a commission split or finder's fee was on September 13, 2011, when Reinecker attached an agreement dated August 4, 2011 to an email. Kast claimed never to have seen that agreement previously and accused Reinecker and Graves of fraudulently creating the document for this litigation. Although the August 4, 2011 agreement was attached to the complaint and shown to Kast at the deposition, Kast denied seeing it before trial. The trial court found that Kast was unable to sensibly explain why he made reference in his September 13, 2011 email to their 50-50 "verbal agreement" as if such agreement related to the 2011 transaction rather than the 2009 transaction.

Kast testified that in September 2011, he offered to pay Graves and Reinecker 50 percent of the $40,500 commission because they were harassing him so much. The condition he attached was that he needed the social security or tax identification information for the payees so he could issue 1099 forms. Kast testified he never would have considered a deal to give Reinecker $38,000 without 1099 forms because Kast would be taxed on the full $40,500 commission when he only received $2,500.

Kast admitted he was having cash flow problems in 2011, but explained he has significant assets and did not need $2,500 that badly. Kast repeatedly testified he consulted his "mentor" on September 5 or 6, 2011, who advised him that giving Reinecker a finder's fee of all but $2,500 of the commission was illegal. However, earlier in his testimony, he denied having any knowledge of such a lopsided agreement until September 14, 2011, when he read Reinecker's September 13, 2011 email. Kast also testified that the same mentor told him a 50-50 split with Reinecker was illegal.

6

When asked on cross-examination why he then agreed to give Reinecker 50 percent after being advised of the illegality, he subsequently stated his mentor just told him he needed to "'check it out.'" When questioned why he withdrew his offer to give Reinecker 50 percent, he said he unilaterally cancelled the deal when she refused to give him her social security number and reiterated that it was not the terms of their agreement anyway.

Kast claimed to have paid between $1,200 and $1,300 for errors and omissions (E&O) insurance to cover this transaction, and asserted it would have made no sense for him to agree to the terms alleged by Reinecker, as he would have netted less than $1,300 while exposing himself to potential liability. He testified that he contacted his E&O carrier sometime after September 14, 2011. By that time, however, escrow had already closed. Kast was unable to explain why he waited so long to contact his insurance carrier, nor did he provide any proof that E&O insurance had ever been purchased for this transaction.

Graves did not receive any of the $38,000 finder's fee. Kast asserted Graves's preparation of the documentation for the sale was illegal. Kathleen Bransfield, the licensed real estate agent representing the buyers in this transaction, testified that based on her experience, Graves performed tasks a listing broker would traditionally perform. Bransfield also testified that she was never given any information about the "'listing agent'" nor did she have any contact with him, which is unusual. The court found that this testimony corroborated Reinecker's position that Kast was hired simply to sign documents.

At oral argument, Kast represented that Graves was working on the sales transaction under his supervision, and was performing work he described as more "clerical" in nature. Reinecker's counsel agreed with Kast's description of Graves's role. They both agreed that Reinecker was a finder; it was not disputed that Reinecker brought Kast into the deal as the seller's broker.

7

**DISCUSSION**

**I.     The Agreement Is Not Unenforceable Under California Business and Professions Code Section 10136.**

We review issues of law under a de novo standard of review.  (*North Pacifica LLC v. California Coastal Com.* (2008) 166 Cal.App.4th 1416, 1427.)

      a.     <u>Reinecker Was a Finder Entitled to The Exception to Section 10136.</u>

Kast asserts Reinecker is prohibited from bringing suit in this matter by section 10136, which states:  "No person engaged in the business or acting in the capacity of a real estate broker or a real estate salesman within this State shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he was a duly licensed real estate broker or real estate salesman at the time the alleged cause of action arose."  "The purpose of the [real estate] licensing requirement is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners."  (*Schantz v. Ellsworth* (1971) 19 Cal.App.3d 289, 292–293.)  However, one who simply finds and introduces two parties to a real estate transaction need not be licensed as a real estate broker in order to collect a finder's fee.  (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1452.)  Such an intermediary or middleman is protected by the so-called "finder's fee" exception to section 10136, which holds that "a person does not act as a broker if his activity is limited to arranging an introduction between an owner and a prospective purchaser [citations], [although] activity beyond that point may bring him within the regulated field."  (*Spielberg v. Granz* (1960) 185 Cal.App.2d 283, 290.)  Further, a person not licensed as a real estate broker or salesman may recover compensation under an agreement with a licensed broker to pay him a percentage of the commission received by the broker from the sale of realty to a prospective purchaser if the person were to introduce the broker to that purchaser.  (*Pawlak v. Cox* (1957) 148 Cal.App.2d 294, 297.)  "The line between brokers and finders is based on whether the person in question has engaged in any negotiating to consummate the transaction."  (*Preach*, at p. 1452.)  The law is established that "'[i]f the broker takes

8

any part in the negotiations, no matter how slight, he is not a middleman but a broker.'" (*Ibid.*) We concluded in *Pawlak*, that plaintiffs who referred prospective buyers to a licensed real estate broker could collect a portion of the commission arising from any sales, because it was clear that plaintiffs performed no function at any stage of the proceeding other than that of introducing the buyer to the broker and performing such acts as were necessary to introduce the parties and keep them in contact. (*Pawlak*, at p. 297.)

Like the Pawlaks, Reinecker did not participate in negotiations or perform any activities which would take her out of the scope of the finder's fee exception to section 10136. In the trial court's statement of decision, the trial court explicitly stated there was no evidence to suggest Reinecker became involved in any of the negotiations in any way or acted as anyone other than the one who brought Kast to Graves. Graves, and not Reinecker, prepared all of the documents for the sale of the property in accordance with the deal points directed by her employer, HSP. Reinecker met the definition of a finder.

b.      Kast Has Forfeited Arguments Made on Appeal Because He Did Not Raise Them in the Trial Court.

Kast argues Graves's allegedly unlicensed activities should be imputed to Reinecker. The record before us does not indicate Kast raised this issue at trial. Generally, matters not raised in the trial court, especially fact-based theories, will not be considered on appeal. (*Baugh v. Garl* (2006) 137 Cal.App.4th 737, 746; *Bardis v. Oates* (2004) 119 Cal.App.4th 1, 13–14, fn. 6.) The settled statement and the statement of decision indicate Kast raised only two legal arguments at trial, neither of which was a theory of imputation. Kast is precluded from raising this issue for the first time on appeal.

Kast asserts Reinecker is bringing suit to enforce an agreement "whereby the vast majority of the legitimate real estate broker's commission is to be paid to an unlicensed individual as consideration for another unlicensed individual's work." This is not true. Reinecker brought suit to enforce an agreement to receive a portion of the real estate broker's commission as consideration for bringing the broker and the seller together. It is

9

well settled that this type of arrangement is legal.  (*Pawlak v. Cox*, *supra*, 148 Cal.App.2d at p. 297.)

Kast also asserts Reinecker should be prohibited from collecting any commission from this transaction because she and Graves were involved in a joint venture and both were unlicensed.  When "'licensed services are performed by two or more persons as a joint venture or partnership and one of them is not duly licensed, the entire transaction is void and unenforceable and *neither* person can collect compensation for the services.'" (*Preach v. Monter Rainbow*, *supra*, 12 Cal.App.4th at p. 1456.)  In *Preach v. Monter Rainbow*, the plaintiff was prohibited from collecting any commission as a finder in a lease transaction because his joint venture involved an unlicensed broker.  (*Id.* at pp. 1445–1446.)  Kast's claim lacks merit because a joint venture requires, among other requirements, that (1) "the members have joint control over the venture," (2) they "share the profits of the undertaking," and (3) "the members must each have an ownership in the enterprise."  (*Orosco v. Sun-Diamond Corp.* (1997) 51 Cal.App.4th 1659, 1666.)  Nothing in this record indicates that Graves and Reinecker shared or intended to share the profits from this transaction.  There was no joint venture.  Section 10136 did not prohibit Reinecker from bringing this action.

On appeal, Kast also asserts that the alleged oral agreement between Kast and Reinecker violates the statute of frauds and that the doctrine of unclean hands applies to Reinecker.  Kast included a statute of frauds defense in his answer, but did not argue the statute of frauds at the court trial and thus has forfeited the issue on appeal.

"Traditionally, the doctrine of unclean hands is invoked when one seeking relief in equity has violated conscience, good faith, or other equitable principles in his prior conduct.  [Citations.]  Accordingly, one who violates his contract cannot have recourse to equity to support that violation."  (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 727.)  Kast included this defense in his answer, but the "defense of unclean hands must be raised in the trial court to be available" so that the court may pass on the defense and also to permit the person against whom it is asserted the opportunity to present evidence in his defense.  (*Id*. at p. 726.)  By

failing to do so in the trial court, Kast is precluded from asserting an unclean hands defense.

## II. Substantial Evidence Supports the Trial Court's Finding That an Agreement Existed for Kast to Pay Reinecker $38,000.

On appeal, Kast asserts there is insufficient evidence to support the trial court's conclusion that a verbal agreement existed upon the terms enforced by the trial court. Kast alleged the trial court did not weigh the evidence properly. We do not reweigh the evidence or express our independent judgment on the evidence. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.) "The power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination of whether there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." (*Ibid.*) Where a challenge is made on appeal to the sufficiency of the evidence in the trial court, the appellant's burden is a heavy one; he must show there is no substantial evidence whatsoever to support the findings of the trier of fact. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

We have reviewed the entire record and conclude there is substantial evidence to support the trial court's finding that Reinecker and Kast agreed that Kast would serve as the listing agent for the sale of the condominium in exchange for $2,500. Reinecker testified she approached Kast, a licensed real estate agent, on behalf of her sister Graves, to act as the listing agent for the sale of the condominium. Reinecker testified that she and Kast had hit hard times and this deal would give them each cash for a minimal investment of time and effort. Reinecker further testified that she contacted Kast by phone around August 3, 2011 to ask Kast if he would be the listing agent on the property in exchange for $2,500, to which she said Kast agreed. When Reinecker emailed Kast a real estate listing agreement the next day, Kast wrote back, "'What am I supposed to do with the agreement? Sign it now, send it back?'" This is substantial evidence of an oral agreement between Kast and Reinecker.

Additionally, Graves's testimony is evidence in support of the trial court's conclusion that an oral agreement had been reached between Reinecker and Kast

11

whereby Kast would be paid $2,500 for services as a listing agent and Reinecker would receive $38,000 as a finder's fee. Graves chose not to hire the two real estate agents for this transaction whom she had previously hired for HSP transactions. The trial court found that if she intended for the listing agent to receive the full commission, it would make sense for her to hire the same people with whom she had successfully worked with in the past. The trial court asserted that at the very least, Graves would have hired a local agent who would assist her with all the paperwork involved in this type of transaction. Additionally, Graves made it clear from the very beginning that Kast was not to do anything related to the sale, which he never questioned. This corroborates Graves's position that she always intended to do all the work and only needed a licensed agent to sign the documents. The first mention of a verbal agreement, furthermore, occurs in an early email exchange between Graves and Reinecker, in which Graves writes, "'He agreed to the $2,500 fee. . . . Why is he emailing me and asking what the commission split is?" This shows it was Reinecker and Graves's intention, from the beginning, to hire Kast for $2,500. Nothing in the subsequent emails supports anything to the contrary.

The trial court, furthermore, specifically found that Kast's trial testimony was not credible, as it was replete with contradictions and failures of memory. "[A] credibility determination is uniquely the province of the trial court." (*Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 884.) Just as the Court of Appeal may not reweigh the evidence in considering whether the trial court abused its discretion, the court does not reassess credibility determinations. (*Ibid.*) The court listed the evidence to support its finding that Kast was not a credible witness in its statement of decision and judgment. First, Kast initially denied signing any listing agreement, later said he did sign one but did not keep a copy, and subsequently he said he did not recall ever signing a listing agreement but stated he must have done so because it was not an issue during escrow. He testified that he could not recall the commission split on the listing agreement he signed or may have signed, but assumed his share was two percent. Later he testified he recalled the listing agreement provided that his share was one and a half percent. Second, Kast asserted it would have made no sense for him to enter into the

12

agreement because he purchased E&O insurance for $1,200 to $1,300, which means he would have only netted $1,300 to $1,200.  However, Kast testified he contacted his E&O insurance carrier sometime after September 13, 2011, after escrow had already closed. Kast was not able to explain why he waited so long to contact his insurance carrier and he was unable to provide any proof that E&O insurance had ever been purchased.  Third, Kast argues that the trial court's finding of the existence of a contract to provide broker's services for only $2,500 defies common sense.  He posits that no one would purchase insurance—assuming that he even did so—and take the risk of liability for the transaction for only $2,500.  There was evidence to support the conclusion that the deal came to Kast on a silver platter from Reinecker.  He did not have to conduct any open houses; Graves prepared all the paperwork, which he just supervised; he never met the sellers; he never visited the property; and he did not take part in any of the negotiations with the buyer's broker.  Accordingly, the trial court could have found that the $2,500 was in line with the level of service he provided as a listing agent.

Substantial evidence supports the trial court's finding that an oral agreement existed between Kast and Reinecker for Kast to pay Reinecker $38,000.

### DISPOSITION

The judgment is affirmed.  Costs are awarded to Diana Reinecker.

NOT TO BE PUBLISHED.


JOHNSON, J.

We concur:


ROTHSCHILD, P. J.


BENDIX, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.